**GENERAL MOTORS CORP.,**
Petitioner,

v.

Rita L. IRACHETA, Administrator of the Estates of David Iracheta, Deceased, and Edgar Iracheta, Deceased, Respondent.

No. 02–0932.

Supreme Court of Texas.

Argued Sept. 25, 2003.

Decided April 8, 2005.

Kern, LLP, Dallas, Darrell L. Barger, Hartline Dacus Barger Dreyer & Kern, LLP, Corpus Christi, Sharon E. Callaway, Crofts & Callaway, P.C., San Antonio, Donato D. Ramos, Law Office of Donato Ramos, Laredo, for petitioner.

George Russell Meurer, Kenneth A. Valls, Wilson Trevino Freed Valls & Trevino, LLP, Laredo, Robert E. Lapin, Lapin & Landa, L.L.P., Houston, Vincent L. Marable III, Paul Webb, P.C., Wharton, Luther H. Soules III, Langley & Banack, Inc., San Antonio, for respondent.

Justice HECHT delivered the opinion of the Court.

Silvandria Iracheta was driving a 1988 General Motors Oldsmobile Toronado on a two-lane highway near Laredo just after noon on a clear day when she suddenly veered across the center line into an oncoming 18–wheeler at a closing speed of over 100 m.p.h. The truck rolled over the car, ripping off its hood and roof, and severely damaging its left side. The collision ruptured the truck's fuel system, splattering diesel over both vehicles that exploded in flame. Several minutes after the car came to rest at the side of the road, a second fire exploded, this one fueled by gasoline from the car. Silvandria died instantly in the collision, and her four-year-old son David, seated in the back, may have as well. Her other passenger, nine-year-old son Edgar, belted in the passenger seat, remained conscious and died in the second fire.

The boys' grandmother, Rita L. Iracheta, sued General Motors Corporation on behalf of their estates.[1] (The boys' father could not be found to bring a wrongful death action.)[2] A jury failed to find that

Cary Alan Slobin, Jeffrey Cox, Kyle H. Dreyer, Hartline Dacus Barger Dreyer &

---

**1.** See Tex. Civ. Prac. & Rem.Code § 71.021.

**2.** See id. § 71.004(a) (stating that a wrongful death action "is for the exclusive benefit of

Silvandria's negligence caused the boys' deaths and found instead that Edgar's death, but not David's, was caused by a design defect in the car which allowed gasoline to siphon from the fuel system. The jury found Edgar's pain and anguish damages to be $10 million. The trial court rendered judgment on the verdict, only General Motors appealed, and the court of appeals affirmed.[3]

In this Court, General Motors raises a number of issues, one of which, we conclude, is dispositive: there is no evidence that the second fire was caused by the defect in the Toronado. Accordingly, we reverse the judgment of the court of appeals and render judgment for General Motors.

Iracheta's proof of causation rests on the testimony of two expert witnesses. One, Eduardo Sanchez, testified on the origins and causes of the fires resulting from the collision. The diesel from the truck's ruptured fuel system, he said, exploded on impact in a fireball that, although intense, lasted only the few seconds it took for the Toronado to skid down the highway to a stop. Consistent with the accounts of the truck driver and two other men at the scene, Sanchez testified that after this first flash fire, small spot fires broke out and continued to burn in the car's engine and passenger compartments and in the grass around the vehicle for about ten minutes, more or less. The three men approached the vehicle and tried to free Edgar, who was screaming in pain in the front seat, but the car was too hot for them to reach inside. Suddenly, they heard what they described as a "whoosh" sound at the rear of the vehicle, and the second fire exploded, fueled by gasoline from the car. Although the gas tank had remained intact,

Sanchez testified that gasoline leaked from the fuel system onto the ground for several minutes until the vapors ignited.

Determining whether the car's fuel system *could* leak was not, according to Sanchez, within the scope of his expertise. For that, he said, he relied on Iracheta's other expert, John Stilson, a mechanical engineer with experience in accident reconstruction. Stilson testified that gasoline could leak or siphon from the fuel tank only through a return line that ran from the engine along the left side of the car to the tank. The line was made of steel tubing and did not rupture in the collision, but it was attached on one end to the engine and on the other to the tank by short, flexible rubber hoses that were both found to have burned away at some point. Tests Stilson conducted on a similar vehicle showed that when the car was inclined toward the front, as Iracheta's was when it came to rest off to the side of the highway, gasoline would siphon out of the tank onto the ground if either the front hose or the rear hose was opened. This condition, Stilson testified, was a design defect in the car.

Although Stilson found that gasoline would siphon from the return line at either end, depending on where the breach occurred, Iracheta concedes that she had to prove that gasoline leaked at the rear of the car rather than the front, since all of the witnesses present at the scene testified that the "whoosh" and the second fire came from the rear, and Sanchez testified that the fire could not have happened as it did if gasoline had not siphoned at the rear. Furthermore, Iracheta concedes that she was required to prove that the rear hose was severed or torn in the impact before it burned; otherwise the gaso-

the surviving spouse, children, and parents of the deceased").

**3.** 90 S.W.3d 725 (Tex.App.-San Antonio 2002).

line escaping from the burning hose would have been ignited immediately by the flame and there would never have been the "whoosh" sound that everyone present heard. As Iracheta's counsel explained at oral argument:

> JUSTICE: You do have to show siphoning occurred at the rear to get causation here on this record, because it would be inconclusive if there were only siphoning at the front?
>
> COUNSEL: We have to present evidence that a jury could reasonably find that the siphoning caused a spill at the rear of the car, yes.
>
> JUSTICE: Does it matter how the rear opened up? Does it matter whether it burned through or whether it was caused by the collision?
>
> COUNSEL: I think it may, and the reason for that is the "whoosh". Again, it comes back to: how did this car suddenly, after several minutes—from 10 to 20 minutes—become engulfed in this cloud of flames that ultimately killed Edgar Iracheta? If the line burned, there could have been just a jet stream of flame like at the end of a welding torch, which might not create that "whoosh". And here the spill at the rear—where there was no immediate fire, or no testimony that there was any

immediate fire, falling on the ground—creating a vapor that spread until it found an ignition source and then exploded—is what Mr. Sanchez's testimony establishes. Also the eyewitnesses—they were at the vehicle, and that's why this is not a circumstantial evidence case altogether—testified that the fire came from the rear, the "whoosh" came from the rear. And Mr. Sanchez in his investigation in reaching his conclusions talked to all of those eyewitnesses, talked to Stilson, observed the replica of the car, observed the car itself, the damage that went all down the side of the car, including the rear where the rear hose was broken, and that's how he came to his opinion that the rear hose was broken and that's where it siphoned.

The difficulty is that there are significant conflicts in and between the testimony of Sanchez and Stilson, each stressing both the extent and the limits of his own expertise and that of the other. Stilson testified that his assignment in the case was to determine exactly where gasoline leaked or siphoned from the Toronado fuel tank,[4] and that he took it upon himself to make that determination.[5] This, he stated, was his area of expertise, not Sanchez's.[6] Stilson testified that gasoline siphoned at the front of the return line[7] and did not

---

4. "Q In this case, were you asked to determine the exact location of where this particular Toronado siphoned fuel? In other words, if you assume the return line—"

"A Yes. I understand."

"Q Were you asked to identify for purposes of your expert testimony in this case where that happened?"

"A Yes. That was my assignment in this particular case, that I was requested to evaluate the design—not just for siphoning, but to find out whether or not this system leaked gasoline, number one, and number two, whether it should have. That's what I took on for a task."

5. "Q Mr. Stilson, for purposes of this case, did you take it upon yourself to try to deter-

mine where exactly on the return line the opening occurred in the Iracheta accident?"

"A Yes."

6. "Q ... You didn't say, 'That's not my area, go talk to Ed Sanchez,' did you?"

"A Not as far as siphoning and where the lines were compromised, no. I never assign that to anybody but me."

"Q So where it siphoned and where it compromised was your area."

"A My area."

7. "Q Okay. Now ... you believe ... that there was siphoning out of the return line at the front end as the vehicle was at rest, correct?"

"A That is correct."

siphon at the rear.[8] The rear hose on the return line, he said, was not injured in the collision but burned away in the fire.[9]

Sanchez testified at his deposition that he could not say where the leak in the return fuel line occurred,[10] that he was unable to establish whether the line had been compromised at impact,[11] that he was not an expert on that subject, and that he

"Q  All right.  And that's what you believe now; is that correct?"
"A Yes, I do."

8. "Q ... Second, ... did you testify that the leakage did not come from the hoses at the back of the tank because they were not compromised in the collision?"
"A In my deposition, that's what I have stated."
"Q  All right.  And that's your opinion?"
"A That's my opinion."

9. "Q [Question from your deposition:] 'Do you believe that the elastomeric hose for the return line back at the tank was burned away?' 'Answer: Correct.' 'Question: I mean, it didn't suffer collision-related damage that caused it to separate?'  And your answer was what?"
"A Yes."
"Q  'That is correct'?"
"A 'That is correct.' "

10. "Q [Question from your deposition:] 'With regard to where you believe the siphoning occurred, you're saying somewhere I believe between the carburetor, or where the fuel enters the engine, and the tank.  Is there any more specificity you can give me other than that?'  And your answer, sir, was, 'No, sir.  I cannot.  The fuel lines between the tank and the area where they come into the engine compartment, where they connect to the flex lines at both ends, somewhere between point A and point B, I can't be more specific than that.'  That's what you told us, right?"
"A That's correct."

11. "Q  Question [from your deposition]: 'When you say "compromise," were you able to pinpoint through the fire patterns or any of your investigation a location of compromise [of the fuel line] or are you assuming compromise because of damage to the vehicle'?"
"A Answer—"

would leave the determination to someone else.[12]  At trial, however, Sanchez was "100 percent" certain that the leak occurred at the rear of the car [13] and not at the front.[14]  For one thing, he said, there was no evidence of intensified fire in the front,[15] and for another, a leak at the front of the car could not have caused the "whoosh" at the rear.[16]  Furthermore,

"Q  And you answer was?"
"A The answer was: 'I am unable to establish which line was compromised or whether it was compromised at impact.' "

12. "Q Okay.  Didn't you say [in your deposition] that you don't know where the siphoning was, that you're not an expert, you leave that to someone else, and that it was somewhere between point A and point B on that line which was all the way from the engine to the gas tank?"
"A That's correct.  And I answered [opposing counsel] on about four different times.  He kept asking me and then he jarred my memory.  And ... I attempted to explain this process that I'm covering here."

13. "Q Well, today you're saying I can be more specific than that because you're saying I know 100 percent it was in the back at the tank on this hose.  You now know that 100 percent today."
"A That's correct."

14. "Q You have ruled out any leak up front which caused the 'whoosh'.  Is that a correct statement?"
"A Yes. Correct."
"Q  So I'm going to write down, number one, ruled out 100 percent.  Fair?"
"A Fair."

15. "Q There is no evidence of a fire—or intensified fire—at the engine compartment?  That's your testimony?"
"A That—"
"Q  That's your testimony?"
"A Yes."

16. "Q If it [that is, the metal return line] is not crimped [up front in the engine compartment], you might be wrong [about whether the line leaked there], right?"

Sanchez stated, he had been told by Stilson that gasoline siphoned from the rear hose because it was damaged by the impact of the two vehicles.[17] But later in his testimony, Sanchez admitted that Stilson had told him many times the rear hose had burned through, not that it broke from the impact of the two vehicles.[18] Sanchez stated that it was impossible for the rear hose to have burned through because gasoline in the hose would have been ignited immediately, without the delay and the "whoosh" sound.[19] He was "100 percent" sure of this, too.[20] Yet at another point he testified that where the leak occurred was immaterial because fires inside the car and in the surrounding grass could have ignited the gasoline vapors.[21] The internally

"A I might be wrong that it is not crimped. I might be wrong that we didn't have a siphoning. The siphoning at that end does not create the 'whoosh' under the car at the opposite end of the car."

17. "Q All right. My question to you is though: As far as the location of the siphoning, it occurred there [at the rear hose near the fuel tank] because Mr. Stilson told you that. And that is an integral part of your opinion."
"A Certainly."

* * *

"Q At impact, this terrific impact knocked off this rubber hose and the car came to rest and that's where it siphoned in the back. And that's what Mr. Stilson told you."
"A That's basically what conclusion I reached as well based on all the information that I got."
"Q But my question is that's what—as you've told us before—that's what Mr. Stilson told you and that's what you used because you're not an engineer and you can't say it didn't happen."
"A That's correct."

* * *

"Q I just want to make sure that's what Mr. Stilson told you."
"A Yes, sir. Essentially that's what he told me."

18. "Q ... Did Mr. Stilson tell you it was his engineering opinion that that rubber hose [at the rear near the tank] broke upon impact of the two vehicles?"
"A He told me that it burned."
"Q That's right. He told you that many times, didn't he?"
"A And I told—yes, sir, he did."

19. "Q It's impossible because if it [that is, the rear hose] burned through, as Mr. Stilson says, you would have had a fire immediately, wouldn't you?"

"A Yes, sir. Correct."
"Q I mean, you can't burn through a hose full of gas without having a fire, can you?"
"A If it is, in fact, full of gas at the time, yes, sir."
"Q Well, under your theory it's siphoning, so it has to be. Right?"
"A It siphons when the line is open, sir."
"Q But under your theory, if it's burned through, you would have had a fire right there immediately, right?"
"A Yes."
"Q Okay. So you're going to rule out 100 percent that the 'rear hose on the return line at the tank burned through prior to siphoning.' Right?"
"That's correct."

20. "Q But you can tell for sure—you are 100–percent certain—that this rubber hose [at the rear] was thrown off at impact, aren't you?"

"A It would have to have been compromised."
"Q You are 100–percent certain, aren't you?"
"A I am conclusive on that, yes."

21. "Q You say [in your deposition regarding where the siphoning occurred], 'At some point from the front end of the feed and/or the return line to the lower end of the tank.' And then you say, 'Personally, I feel that it is from the back end simply because the detonation occurred underneath the vehicle at the back end.' You told [Stilson] that, correct?"

"A Correct."
"Q And then you continue and you say, 'But it could have been either/or. It's immaterial; the gasoline is out of that environment, out of the contained fuel system. Whether it did leak in the front or whether it leaked in the back is immaterial in my opinion.' Correct?"
"A That's correct."

conflicting nature of Sanchez's testimony is perhaps best illustrated in the following answers to questions by Iracheta's counsel within four minutes of each other at trial (as indicated in the reporter's record):

Q I've written up here, sir, the question: where did the line siphon? And I'm referring to the return line. That is a question that you have given an answer to in this case, correct?

A That's correct.

Q Would you tell us your understanding of whether or not that was Mr. Stilson's area of expertise for purposes of this case?

A Yes, it was.

* * *

Q So although Mr. Stilson was asked his opinion in the case with regard to the question of where did the return line siphon, would you tell the jury is that your area to answer?

A That is my area of expertise.

To support his opinion that gasoline siphoned from the rear hose, Sanchez offered simply that he had excluded the only other possibility,[22] which was that gasoline or vapors from the filler neck (where gasoline is pumped into the tank) ignited. He believed that vapor from the tank would be too lean,[23] and that the gasoline in the tank would have had to boil out onto the ground before it could ignite, which it was not hot enough to do.[24] Sanchez asserted that the grass fires were not hot enough to have caused gasoline or vapors to escape from the filler neck and ignite,[25] even though he had testified that those same fires could

"Q All right, sir. Now can you explain to us why—explain first of all what that answer means?"

"A Essentially the question here is why is the fuel out of the—or confined fuel system. That is the question. The question is not what detonated it or what ignited it because there were a multitude of things around there. Fire in the grass around it, there were fires in the engine area, there were fires in the dashboard area, fires on the—in the interior cab. And that's why I mention that it's immaterial. The question here is why did the fuel get out of the enclosed fuel system and how did it get out. That's what I'm addressing there."

22. "Q All right, sir. Have we then eliminated all the potential candidates for where the gasoline might have siphoned out of this tank other than one?"

"A That's correct."

"Q And what is the one, then, that you conclude is the true source of the siphoning?"

"A Return line. Siphoning through the return line at the rubber connections."

"Q At which rubber connection, sir? You've identified two."

"A At the tank."

23. "Q Okay. So why was there not enough vapor to escape from the filler neck to have created this 'whoosh'?"

"A Because it's not going to be a sufficient quantity of vapors. It's going to be very lean. It's going to be under the lower explosive limits of gasoline . . . ."

24. "Q Yes, sir. To generate the vapors sufficient to have them go out of the filler neck, what do you need?"

"A The fuel is going to have to be on the ground. It's going to hit the soil. It's going to be absorbed by the soil—"

"Q I'm talking about the filler neck, sir."

"A From the filler neck. It would have to boil over, fall to the ground—exit the tank, fall to the ground, and vaporize on the ground to have the amount of vapors that we had to cause this violent reaction."

"Q Was the fuel boiling?"

"A No, not in my opinion. There was no—there was no intense heat of any duration to cause that."

25. "Q Even if there had been some grass burning right underneath the tank, given the conditions of that grass out there, the wind, and other matters out there, all the evidence together, would it have been sufficient to boil the gasoline in this tank?"

"A In my opinion, no."

"Q Not a chance?"

"A Not a chance, no."

have ignited any gasoline leak, and despite the unchallenged testimony of the eyewitnesses that fires in and around the car made it too hot to approach. Sanchez also asserted that the initial flash fire was too short in duration to heat the fuel tank.[26] Sanchez cited no testing or other basis for these opinions.

Confronted at trial by Sanchez's testimony the previous day, Stilson stated that while he still believed that the rear hose had burned away, instead of being severed in the impact, his was only "one explanation".[27] Although Stilson continued to insist that the return fuel line siphoned at the front of the car, contrary to what Sanchez had said, he would not "take exception" with Sanchez that siphoning at the rear was a "possibility".[28]

The court of appeals concluded that "Sanchez was not qualified to render an opinion regarding where the siphoning actually occurred",[29] and further, that "[n]othing in the record shows Sanchez's engineering opinion—that the fuel line ruptured in the rear end of the car is—reliable."[30] The court nevertheless concluded that "there is legally sufficient evidence to support a finding that the Toronado's fuel system failed during the crash",[31] namely:

Stilson's opinion that the front rubber hose of the return line failed in some manner; Stilson's opinion that one explanation for a compromise in the rear hose is that it burned away; and [General Motors' expert's] opinion that the hoses did not rupture.[32]

---

**26.** "A ... The same thing happened in the flash fire at impact."

"Q With the gas tank?"
"A With the gas tank. Why? Because it lasted for a matter of seconds, number one. Number two, the tank is protected by the vehicle because it's underneath. So in my opinion there was not enough time to transfer heat from that fireball or flash fire on the tank to bring it to a boil-over."

**27.** "Q Did you ever offer an opinion, Mr. Stilson, regarding what you think might have caused the rear hose to open in this accident?"

"A Yes."
"Q And what was your opinion, sir?"
"A My opinion was and is that one explanation for the opening of that rubber hose was it was burned away by the fire. That's one explanation. Because it's burned away right now. The remnant of the return line hose from the connection at the steel that goes back up to the tank down to where it connects to the underbody hose, it goes—or line that goes forward to the engine, that transition of rubber hose is all burned away right now. So I know it burned away at some point."

**28.** "Q So Mr. Sanchez has ruled out any leak up front, and you disagree with that?"

"A Yes. I don't think that is correct."

"Q And Mr. Sanchez has ruled out that the return lines were burned up, and you don't agree with that either?"
"A No. I defer to his opinions on that. If he has come to the conclusion that the fire in the rear of this vehicle was more consistent with the rear lines, that's fine. I defer to him."

\* \* \*

"Q But with regard to the question of the details of whether there was enough heat to burn it through versus the forces of the impact, you defer to Mr. Sanchez?"
"A Well, I will defer—Ed Sanchez is certainly the fire area, and whether they burned through during the fire, I will certainly defer that. That is his area. As far as his opinion, again, I think Ed Sanchez is coming from the fire position, looking backwards towards the system. Obviously, he saw some trauma that he feels could have compromised those hoses, and I will defer to him, if that's his opinion. I certainly am not going to take exception to that. It is certainly a possibility and I agree with him."

**29.** 90 S.W.3d at 731.

**30.** *Id.* at 732.

**31.** *Id.* at 733.

**32.** *Id.*

But none of this evidence supports a finding that a fuel system failure resulted in the second fire. There is no evidence that the second fire could have been caused by a failure of the front hose or the burning of the rear hose; indeed, Sanchez's testimony was exactly the opposite. The court's cite to General Motors' expert's testimony in this context is difficult to understand, since it directly contradicts Iracheta's theory that the rear hose was ruptured by the impact. The court of appeals added:

> Problematically, Stilson theorized that the return line[ ] opened near the front of the vehicle as a result of the initial impact, but Sanchez determined that the fire detonated near the vehicle's rear. Although this conflict may appear to be fatal to Iracheta's claim, Sanchez recognized that there might be a conflict between his theory and Stilson's. Specifically, Sanchez stated: "But it could have been either/or, it's immaterial, the gasoline is out of that environment, out of the contained fuel system. Whether it did leak in the front or whether it leaked in the back is immaterial in my opinion." [33]

We agree with the court of appeals that the conflict between Stilson and Sanchez appears fatal to Iracheta's claim, but we do not agree that the conflict can be avoided by Sanchez's bare assertion that "it's immaterial". Undisputedly, gasoline could have siphoned from the return fuel line at both the front and the rear. Tests proved that. But there is no evidence that siphoning at the front could have caused the second fire in the way every witness testified it occurred. Indeed, Sanchez himself testified that siphoning at the front *could*

*not* have caused the second fire.[34] For Sanchez to characterize his conflict with Stilson as "immaterial" is contradicted by their testimony.

We agree with the court of appeals that Sanchez was not qualified to testify. It was Iracheta's burden to establish Sanchez's qualifications.[35] Sanchez and Stilson both testified that Sanchez was not qualified to offer an opinion on where the siphoning occurred. Although both also equivocated on the subject, experts cannot be as ambivalent as these two were and establish the privilege of offering opinion testimony under Rule 702 of the Texas Rules of Evidence.

Furthermore, while Sanchez did assert that gasoline siphoned from the return fuel line at the rear of the car, the only support he offered for this opinion was that he had eliminated all other possibilities. He eliminated the obvious possibility that fuel or vapors from the tank filler neck ignited only by saying so, offering no other basis for his opinion. Such a bare opinion was not enough. Just last year we wrote:

> We noted in *Burrow v. Arce* that, although expert opinion testimony often provides valuable evidence in a case, "it is the basis of the witness's opinion, and not the witness's qualifications or his bare opinions alone, that can settle an issue as a matter of law; a claim will not stand or fall on the mere *ipse dixit* of a credentialed witness." *Burrow v. Arce*, 997 S.W.2d 229, 235 (Tex.1999). Opinion testimony that is conclusory or speculative is not relevant evidence, because it does not tend to make the existence of a material fact "more probable or less

33. *Id.*

34. See note 16 *supra*.

35. *Broders v. Heise*, 924 S.W.2d 148, 151 (Tex. 1996) ("[T]he party offering the expert's testimony bears the burden to prove that the witness is qualified under Texas Rule of Civil Evidence 702.").

probable." *See* Tex.R. Evid. 401. This Court has labeled such testimony as "incompetent evidence," and has often held that such conclusory testimony cannot support a judgment. *Cas. Underwriters v. Rhone*, 134 Tex. 50, 132 S.W.2d 97, 99 (1939) (holding that a witness's statements were "but bare conclusions and therefore incompetent"); *see also Wadewitz v. Montgomery*, 951 S.W.2d 464, 466 (Tex.1997) ("[A]n expert witness's conclusory statement ... will neither establish good faith at the summary judgment stage nor raise a fact issue to defeat summary judgment."). Furthermore, this Court has held that such conclusory statements cannot support a judgment even when no objection was made to the statements at trial. *Dallas Ry. & Terminal Co. v. Gossett*, 156 Tex. 252, 294 S.W.2d 377, 380 (1956) ("It is well settled that the naked and unsupported opinion or conclusion of a witness does not constitute evidence of probative force and will not support a jury finding even when admitted without objection."); *Rhone*, 132 S.W.2d at 99 (holding that "bare conclusions" did not "amount to any evidence at all," and that "the fact that they were admitted without objection add[ed] nothing to their probative force"); *see also Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 712 (Tex.1997) ("When the expert 'brings to court little more than his credentials and a subjective opinion,' this is not evidence that would support a judgment.... If for some reason such testimony were admitted in a trial without objection, would a reviewing court be obliged to accept it as some evidence? The answer is no.").[36]

Thus, even if Sanchez had been qualified to testify about where gasoline leaked, none of his opinions rise to the level of competent evidence.

■ Moreover, Sanchez's testimony was rather clearly unreliable. It had no basis outside his own assertions, which were irreconcilably self-conflicting. A fair view of his testimony is that he was willing to say almost anything, directly contradicting himself.[37] Iracheta argues that General Motors waived any complaint regarding the reliability of Sanchez's testimony by waiting until the end of cross-examination to object. But the utterly conflicting nature of Sanchez's testimony was not fully apparent until cross-examination. Indeed, the conflict in his testimony regarding his and Stilson's respective expertise did not occur until redirect. The unreliability of expert opinions may be apparent as early as the discovery process but also may not emerge until trial, during or after the expert's testimony, or even later. An objection must be timely, but it need not anticipate a deficiency before it is apparent. Here we cannot say that General Motors' objection following cross-examination came too late.

■ Apart from Sanchez's testimony, only Stilson's could support the verdict, and it falls short. In Stilson's view, the rear hose on the return fuel line burned away. But as Sanchez demonstrated, the fire that burned the hose would also have ignited the gasoline siphoning through it, resulting in a fire like a "welding torch" (counsel's description at oral argument), not the "whoosh" that the eyewitnesses all heard. Stilson conceded that injury to the rear hose from the impact was a "possibility" and was willing to "defer" to Sanchez on the matter. But as we have shown,

---

**36.** *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 232 (Tex.2004) (footnote omitted).

**37.** See note.

Sanchez offered no competent opinions on the subject to which Stilson could defer, and the mere possibility that the rear hose was compromised at impact is not enough to support the jury's findings.

Iracheta attempts to borrow from each of her experts pieces of opinion that seem to match, tie them together in an ill-fitting theory, discard the unwanted opinions, disregard the fact that the experts fundamentally contradicted themselves and each other, and then argue that this is some evidence to support the verdict. Inconsistent theories cannot be manipulated in this way to form a hybrid for which no expert can offer support.[38] We therefore conclude that there is no evidence that the siphoning defect in the Toronado caused the second fire in which Edgar died. Accordingly, Iracheta is not entitled to recover against General Motors.

■ We are obliged by one highly unusual occurrence during summation to add this additional note. Rising to begin his argument to the jury, Iracheta's counsel stated: "Mrs. Iracheta has asked for the opportunity simply to stand and thank you for your time as well." Immediately, without leave of court or notice to opposing counsel, Mrs. Iracheta stood and said to an all-Hispanic jury: *"Muchas gracias les doy de parte de mis nietos y mi hija y de parte mia la jurado."* ("Thank you very much to the jury on the part of my grandchildren and my daughter and on my part.") General Motors understandably did not interpose an objection at once but waited until after Iracheta's counsel had finished his argument, and then moved for a mistrial at the bench. The court denied the motion.

■ The court of appeals concluded that General Motors' objection was untimely.[39] We disagree. In these most unusual circumstances, General Motors' counsel was not required to object to a grandmother's expression of appreciation on behalf of her deceased daughter and deceased grandchildren, thereby risking the jury's ire, and it is entirely impractical to think otherwise. At oral argument in this Court, Iracheta's counsel concedes that it was improper for Mrs. Iracheta to address the jury but argues that the error was harmless. We think the harm is manifest to any experienced trial lawyer. A party's personal expression of gratitude to the jury at the close of a case is error that cannot be repaired and therefore need not be objected to.[40]

\*     \*     \*     \*     \*     \*

Accordingly, we reverse the judgment of the court of appeals and render judgment that Iracheta take nothing.

Chief Justice JEFFERSON and Justice GREEN did not participate in the decision.

---

**38.** *See Volkswagen of America, Inc. v. Ramirez,* 159 S.W.3d 897, 911 (Tex.2004).

**39.** 90 S.W.3d at 743–744.

**40.** *Cf. Dow Chem. Co. v. Francis,* 46 S.W.3d 237, 241 (Tex.2001) ("[O]bjection to a trial court's alleged improper conduct or comment must be made when it occurs if a party is to preserve error for appellate review, *unless the conduct or comment cannot be rendered harmless by proper instruction.*") (emphasis added).