IN THE SUPREME COURT OF TEXAS








IN THE SUPREME COURT OF TEXAS
 
════════════
No. 04-1118
════════════
 
City of San Antonio, 
Petitioner,
 
v.
 
Charles Pollock and Tracy 
Pollock, Individually and as next Friends of Sarah Jane Pollock, a Minor Child, 
Respondents
 
════════════════════════════════════════════════════
On Petition for Review from the
Court of Appeals for the Fourth District of 
Texas
════════════════════════════════════════════════════
 
 
Argued October 18, 
2006
 
 
            
Justice Medina, joined by 
Justice O’Neill, dissenting.
 
            
The Pollocks claim that Sarah’s leukemia was 
caused by her in utero exposure to benzene, 
which had migrated from the West 
Avenue landfill into their home. The claim rests on 
the testimony of two expert witnesses: Dr. Mahendra 
Patel, a pediatric oncologist and Sarah Pollock’s treating physician, and Daniel 
Kraft, a petroleum engineer with extensive experience in the design, 
construction, and post-closure maintenance of landfills. Kraft gave his opinion 
about the amount of benzene in the Pollock home, and how it got there. Dr. Patel 
testified that Sarah’s mother’s exposure to benzene during pregnancy caused 
chromosomal damage, and Sarah’s acute lymphoblastic 
leukemia (ALL). Dr. Patel’s opinion was based on a review of the scientific 
literature on the subject, his differential diagnosis, his treatment of Sarah, 
and Sarah’s chromosomal injury that he described as a unique fingerprint of 
benzene exposure and damage in utero.
            
The City concedes that methane and benzene migrated from its landfill 
into the surrounding community. The City also does not contest the underlying 
science relied on by Dr. Patel or the dangers of exposure to benzene, a known 
carcinogen. Instead, the City contends that analytical gaps in the testimony of 
both experts render their respective opinions conclusory. The Court eventually agrees after delving into 
the underlying science. The Court analyzes the relationship between methane and 
benzene, the respective physical properties of both gasses, benzene’s 
relationship to certain types of leukemia and chromosomal damage, and the 
respective testimony of both experts. Most significantly, however, the Court 
concludes that the City did not have to object or point out these analytical 
gaps in the trial court to preserve error. I respectfully disagree.
            
As a general rule, an objection is required to preserve error regarding 
the admission of evidence, and expert testimony is no exception. See 
Tex. R. App. P. 33.1(a); Tex. R. Evid. 
103(a)(1); Osterberg v. Peca, 12 S.W.3d 31, 55 
(Tex. 2000). 
Without an objection, a trial court simply cannot be expected to fulfill its 
role as gatekeeper. Nor can an appellate court assume this role, particularly 
after the witnesses have testified, been dismissed, and the record closed. 
Nevertheless, the Court here assumes the role of gatekeeper ex post 
facto, allowing the City to complain about analytical gaps for the first 
time on appeal. Because the City did not object to the reliability of either 
expert witness in the trial court or complain about the analytical gaps it now 
details in this appeal, I would hold that the complaint has been waived.
I
            
I agree, however, that analytical gaps can undermine the reliability of 
an expert’s opinion. The Supreme Court said as much in General Electric Co. 
v. Joiner, 522 U.S. 136 (1997), observing that courts do not have to focus 
entirely on the reliability of the underlying methodology or technique as in 
Daubert,[1] but are free to test reliability by 
analyzing whether the expert’s opinion fits the facts of the case:
 
[C]onclusions and methodology are not entirely distinct from 
one another. Trained experts commonly extrapolate from existing data. But 
nothing in either Daubert or the Federal Rules 
of Evidence requires a district court to admit opinion evidence . . . connected 
to existing data only by the ipse dixit of the 
expert. A court may conclude that there is simply too great an analytical gap 
between the data and the opinion proffered.
 
Id. at 146; see 
also Richard O. Falk & Robert O. Hoffman, Beyond Daubert and Robinson: Avoiding and Exploiting “Analytical 
Gaps” in Expert Testimony, 33 The 
Advocate 71, 72 (Winter 2005). The Supreme Court also has recognized that 
the trial court’s role as gatekeeper, like other rulings on the admission of 
evidence, is a discretionary decision subject to review only for an abuse of 
that discretion. Joiner, 522 U.S. at 
142-43.
            
This Court soon followed Joiner, concluding in Gammill v. Jack Williams Chevrolet, Inc., that 
an expert’s opinion can be unreliable if there is too great an analytical gap 
between the underlying data and the expert’s opinion.[2] 972 S.W.2d 713, 727 
(Tex. 
1998). We cautioned, however, that the trial court’s job was not to 
determine whether an expert’s conclusions were correct, but only whether the 
analysis used to reach them was reliable. Id. at 728. We further noted that the trial court’s gatekeeper 
decisions in this regard were to be reviewed under the abuse of discretion 
standard. Id. at 
727.
            
A trial court, however, cannot abuse its discretion if it is never asked 
to exercise it. Thus, to preserve a no-evidence complaint that expert testimony 
is unreliable, a party must object in the trial court. See Mar. Overseas 
Corp. v. Ellis, 971 S.W.2d 402, 409-10 (Tex. 1998) (objection made after jury verdict was too 
late); see also Gen. Motors Corp. v. Iracheta, 
161 S.W.3d 462, 471 (Tex. 2005) (objection must 
be made when deficiency becomes apparent); Kerr-McGee Corp. v. Helton, 
133 S.W.3d 245, 252 (Tex. 2004) (motion to strike made immediately 
after cross-examination held timely). But an objection is not invariably 
required; there is a limited exception to the general rule.
            
When the expert’s testimony is speculative or conclusory on its face, a party does not have to object to 
its admissibility to complain that the expert’s naked opinion is no evidence. 
See Coastal Transp. Co. v. Crown Cent. Petroleum 
Corp., 136 S.W.3d 227, 233 (Tex. 2004) (“bare 
conclusions–even if unobjected to–cannot constitute 
probative evidence”). It is obviously important then to distinguish unreliable 
expert testimony from conclusory expert testimony 
because the former requires a timely objection, while the latter does not. What 
then separates the conclusory from the merely 
unreliable?
            
The distinction apparently is the difference between something and 
nothing. As the Court recently explained in Arkoma Basin Exploration Co. v. 
FMF Assocs. 1990-A, Ltd., 249 S.W.3d 380, 389 (Tex. 2008): An expert’s 
testimony is conclusory if the expert merely gave an 
unexplained conclusion or asked the jury to “take my word for it” because of his 
status as an expert. Arkoma concluded that an expert’s opinions were not conclusory even though the expert’s foundational data was 
not in the record, and it was not entirely clear how the expert had reached his 
conclusions. We wrote:
 
[The 
expert’s] testimony could have been a lot clearer; his references to “up here” 
and “right there” on slides and posters used at trial often make it hard to tell 
what he is talking about. But we cannot say on this record that his opinions 
were unreliable or speculative. Nor were they conclusory as a matter of law; [the expert] did not simply 
state a conclusion without any explanation, or ask jurors to “take my word for 
it.” It is true that without the foundational data in the appellate record, we 
cannot confirm that “cash off my runs ... divided by mcf” yielded the $1.62, $1.41, $1.43, and $1.59 prices he 
calculated as the low range for damages. But experts are not required to 
introduce such foundational data at trial unless the opposing party or the court 
insists.
 
Id. at 
389-90 (footnotes omitted). Arkoma further explained when a party 
should object to preserve error:
 
Texas law 
requires an objection to expert testimony before or during trial if the 
objection “requires the court to evaluate the underlying methodology, technique, 
or foundational data,” but no objection is required if the complaint “is 
restricted to the face of the record,” as when the complaint is that an opinion 
was speculative or conclusory on its face, or assumed 
facts contrary to those on the face of the record.
 
Id. at 388 
(footnote omitted) (citing Coastal Transp. Co., 
136 S.W.3d at 233). Thus, an objection is not required to preserve an appellate 
complaint about an expert’s naked conclusions, but if the expert purports to 
rely on something more than his credentials or reputation, an objection is 
necessary. This exception is rarely applied, probably because naked conclusions 
ordinarily draw immediate objections.
            
The exception was applied in Coastal, however. In that case, 
Coastal failed to object to the following testimony from a trucking-safety 
expert regarding gross negligence:
 
Q: When 
viewed objectively from Coastal's point of view at the 
time of the September ‘93 incident, in your opinion, did Coastal's failure to stop using probes that could have 
[sensor failure] problems, did that involve a high degree of risk, considering 
the probability and magnitude of the potential harm to others?
A: Yes, it 
did, very high.
 
Q: In your 
opinion, did Coastal have an actual subjective awareness of the risk involved in 
failing to stop using probes that can have [sensor failure] problems?
A: Yes, 
again and again.
 
Q: And in 
your opinion, did Coastal nevertheless proceed with conscious indifference to 
the rights, safety, or welfare of others?
A: That’s 
the only conclusion I can draw.
 
Id. at 
231. Distinguishing a no-evidence reliability complaint from a 
no-evidence conclusory complaint, we said that an 
expert’s “bare conclusions–even if unobjected to” are 
not probative evidence. Id. at 
233. We thus drew a “distinction between no evidence challenges to the 
reliability of expert testimony in which we evaluate the underlying methodology, 
technique or foundational data used by the expert and no evidence challenges to 
conclusory or speculative testimony that is 
non-probative on its face.” Volkswagen of Am., Inc. v. Ramirez, 159 
S.W.3d 897, 910 (Tex. 2004) (citing Coastal Transp. Co., 136 S.W.3d at 233).[3] Coastal did not involve a 
reliability challenge requiring an objection in the trial court because there 
was nothing for the trial court to evaluate; the expert did not purport to use 
any methodology, technique, or foundational data but rather merely delivered his 
subjective opinion concerning Coastal’s gross 
negligence. That is not the present case.
            
In rendering his opinion, Kraft, the landfill engineer, used a generally 
accepted Environmental Protection Agency (“EPA”) landfill air model,[4] testimony regarding odors in the Pollock 
home indicative of the presence of organic hydrocarbons, such as benzene, the 
City’s gas monitoring records, a physical site inspection, and two decades of 
historical geologic records and maps. Because no benzene readings had actually 
been taken at the Pollock home, Kraft relied on, among other things, a 1998 
benzene reading from a sealed monitoring well known as GMP-9A. This well was in 
the landfill 100 feet from the Pollock home and 128 feet underground. Although 
the reading at GMP-9A was taken more than four years after Sarah’s alleged in 
utero exposure in 1993, Kraft concluded that the 
benzene levels in the Pollock home would have been equal to or greater than that 
of a sample taken from the well in 1998, that being, 160 ppb (parts per billion) 
benzene.
            
The City argues that Kraft’s opinion is conclusory because he does not explain how the benzene 
concentration level in the Pollock home can be the same as that in a sealed 
testing well. Although Kraft’s opinions were predicated on various reports and 
an EPA landfill gas emissions model, the City maintains that his testimony 
contains a fatal “analytical gap” because he failed to account for atmospheric 
conditions. This analytical gap, the City argues, renders Kraft’s opinion conclusory.
            
The complaint, however, goes to Kraft’s methodology or technique in 
evaluating the data because he was comparing benzene concentrations not only at 
different locations but also at different points in time. Relying on his air 
model, Kraft testified that the benzene levels produced by the landfill peaked 
in the late seventies and began to diminish thereafter. Thus, benzene levels 
would have been higher in 1993 during Sarah’s gestation than in 1998 when the 
benzene reading from the monitoring well was taken. Kraft testified to the 
following without objection:
 
Q.        
Mr. Kraft, have you done any calculations and projections about the migration of 
gas that the – from the West Avenue Landfill to the Pollock home during the 
period 1992 to 1994?
                        
A.        Yes.
 
* * *
 
Q.        
Okay. What kind of records did you look at in reaching your opinions?
A.        
Field data sheets from methane surveys that were done in the neighborhood 
surrounding the landfill, interoffice correspondence with the City of San 
Antonio, letters to the City of San Antonio from the TNRCC [Texas National 
Resource Conservation Committee] and the Texas Department of Health, records on 
geologic data that was collected by City employees, reports that were produced 
by the City’s consultants.
 
* * *
 
Q.        
Do you have an opinion, Mr. Kraft, as to whether the Pollocks were chronically exposed to benzene concentrations 
in their home?
A.        
Yes, I do have an opinion on that.
 
Q.        
And what is that opinion?
A.        
It’s my opinion that they were chronically exposed to landfill gas.
Q.        
And did the landfill gas include benzene?
A.        
Yes, it did.
 
Q.        
What is your opinion of the range of benzene to which they were exposed? And 
please express it in terms of a numerical value.
A.        
I believe that they were consistently exposed to benzene concentrations in the 
vicinity of 160 parts per billion, or even higher.
 
Q.        
In your report, Mr. Kraft, I believe you said 40 to 160 parts per billion; is 
that correct?
A.        
That’s correct.
 
Q.        
Why are you now saying it might be higher than 160 parts per billion?
A.        
For several reasons.
 
Q.        
And what are those reasons?
A.        
Number one would be the gas modeling that I did with the United States 
Environmental Protection Agency model, the — you know, the landfill gas 
emissions model, which indicates that the amount of benzene produced by the 
landfill decreased over time.
 
Q.        
What other reasons, Mr. Kraft?
A.        
The analytical results that were collected at GMP-9 in January of 1998, they 
also measured the oxygen concentration. Landfill gas – landfill gas samples that 
have over 2 percent oxygen indicate that there has been some dilution from 
atmospheric air occurring, therefore, the concentrations that were measured in 
that sample were likely to be slightly lower than they were in the actual 
landfill gas itself, because it was diluted while they were sampling it.
 
            
In accordance with the City’s argument, the Court suggests that Kraft 
testified that the air in the Pollock’s home was the same as that in the sealed 
well, but the above demonstrates this to be an inaccurate representation of his 
testimony. Kraft testified that the concentration of gas in the landfill was 
likely higher than the samples taken from the well because these samples had 
already been diluted with atmospheric air. Thus, the Court assumes the existence 
of an analytical gap that may have existed, but also might have been explained 
had the City made an appropriate objection.
            
Next, Dr. Patel, the pediatric oncologist, gave his opinion that Sarah’s 
in utero exposure to benzene during the first 
trimester caused her ALL. He relied on: (1) his review of the literature, (2) 
the matched pattern of abnormalities in Sarah’s chromosomes and the chromosomal 
abnormalities in lab-induced carcinogenesis caused by benzene exposure, (3) his 
academic background in human genetics, and (4) Kraft’s opinion that Sarah’s 
mother was chronically exposed to at least 160 ppb of benzene while Sarah was 
in utero. Dr. Patel, moreover, excluded other 
plausible factors for Sarah’s ALL, including family history and benzene exposure 
from other sources.
            
While the City acknowledges that Dr. Patel based his opinion, in part, on 
his review of certain epidemiological studies, it maintains that Dr. Patel’s 
testimony is conclusory because none of these studies 
actually support his scientific opinion. In particular, the City argues that 
these studies all involve substantially higher exposure levels and, moreover, 
fail to find a causative association between benzene exposure and Sarah’s 
particular type of leukemia. None of these concerns were brought to the trial 
court’s attention, and Dr. Patel testified without objection.
            
Moreover, Dr. Patel explained that the exposure levels in these studies 
were actually less than Sarah’s daily, chronic exposure 
during gestation. Dr. Patel explained that the effect of a toxin is based on two 
types of exposure, the peak dose exposure and the duration of that exposure. 
Taking both into account, the studies report their results as cumulative 
exposure over time, often as an annual dosage. Dr. Patel testified that the 
Pollocks’ chronic exposure here would convert to a 
much greater annual dosage than those discussed in the studies. Moreover, Dr. 
Patel testified that Sarah’s chronic and cumulative in utero benzene exposure as a developing fetus was more 
significant than the annual exposure to an adult as described in the studies. 
Again, there was no objection to these conclusions.
            
The underlying epidemiological studies referenced by Dr. Patel reflect a 
correlation between exposure to benzene and an increased risk for certain types 
of leukemia. For example, the studies in evidence reflected that occupational 
benzene exposure in the mother was related to a risk of childhood leukemia, 
especially acute nonlymphocytic leukemia (“ANLL”); 
that benzene metabolites could cause chromosomal damage in human lymphocytes; 
that benzene could cross the placenta and harm a fetus; that exposure to benzene 
could cause chromosomal damage similar to that suffered by Sarah; and that 
benzene exposure is responsible for at least a portion of childhood cancers of 
which ALL is the most common. Dr. Patel further testified about epidemiological 
evidence linking benzene to another form of leukemia, acute myeloid leukemia 
(“AML”), and quoted from the article “that evidence linking benzene to AML is no 
less persuasive than for ALL.” None of this testimony came as a surprise to the 
City as Dr. Patel had made these same points in his expert report.[5]
            
The opinions and testimony of the engineer and doctor here are far 
removed from the “bare conclusions” we rejected as conclusory in Coastal. See Coastal Transp. Co., 136 S.W.3d at 232 (witnesses qualifications 
and bare opinion not enough). Neither expert asked the jury to trust their 
opinion merely on the basis of their expertise. They instead purported to 
analyze the underlying data that they (and apparently the City also) considered 
relevant before rendering their respective opinions.      
The City’s present complaints about analytical gaps is 
nothing more than an unpreserved reliability challenge. Analytical gaps are not 
complaints about naked opinions, lacking any basis in the record, but rather are 
assertions that specific errors or omissions in an expert’s analysis render his 
or her opinion unreliable. See, e.g., Ford Motor Co. v. Ledesma, 242 S.W.3d 32, 38-39 (Tex. 2007); Mack 
Trucks, Inc. v. Tamez, 206 S.W.3d 572, 578 (Tex. 
2006); Cooper Tire & Rubber Co. v. Mendez, 204 S.W.3d 797, 800 (Tex. 
2006); Kerr-McGee Corp., 133 S.W.3d at 254; Exxon Pipeline Co. v. 
Zwahr, 88 S.W.3d 623, 629 (Tex. 2002). When the 
complaint is that the expert’s analysis of otherwise reliable scientific data is 
flawed or that the underlying data itself is questionable, a party must object 
to preserve its complaint. See Guadalupe-Blanco River Auth. v. 
Kraft, 77 S.W.3d 805, 807 (Tex. 2002) (“a party must object to the 
testimony before trial or when it is offered”); see also Gen. Motors 
Corp., 161 S.W.3d at 471 (objection must be made when deficiency becomes 
apparent). And the failure to object to expert testimony cannot be cured through 
cross-examination or counter-expert testimony. Gen. Motors 
Corp. v. Sanchez, 997 S.W.2d 584, 590-91 (Tex. 1999). The Court’s opinion today 
unfortunately blurs the distinction between expert testimony that purports to 
have a basis in science (unreliable expert testimony) and expert testimony that 
lacks any apparent support apart from the expert’s claim to superior knowledge 
(conclusory expert testimony).[6] The Court’s decision today is not only 
wrong, it is also unfair and may encourage gamesmanship 
in the future. Why have a pretrial Robinson hearing or make a reliability 
objection during trial and run the risk that the proffering party may fix the 
problem, when the expert’s opinion can be picked apart for analytical gaps on 
appeal? See Robinson, 923 S.W.2d at 552; see also Ellis, 971 
S.W.2d at 411.
            
Reliability objections are important; they serve several purposes. First, 
they give the proffering party an opportunity to cure any defects, thus, 
avoiding trial and appeal by ambush; second, they give the trial court the 
opportunity to test and question the expert’s testimony and thereby 
intelligently perform its role as gatekeeper; and, third, they result in a more 
fully developed record for appellate review under the abuse of discretion 
standard. Ellis, 971 S.W.2d at 409, 412. Because 
the City’s complaints here go to reliability, an objection was required. Because 
the Court holds otherwise, I dissent.
            
            
            
            
            
            
            
            
            
II
            
I agree with the Court, however, that there is no evidence to support the 
Pollocks’ takings claim under article I, section 17 of 
the Texas Constitution for damage to their property. The Pollock’s theory in 
this case was that the City effectively took their property (and caused their 
daughter’s illness) by failing to abate the migration of benzene gas from the 
landfill after learning of the problem. I agree with the Court that there is no 
evidence of the City’s requisite intent for a takings claim here. ___ S.W.3d at 
___ (citing City of Dallas v. Jennings, 142 S.W.3d 310, 314 (Tex. 2004)). Nor do I 
find any basis for the Pollocks’ personal injury claim 
under this constitutional provision.
            
Article I, section 17, entitled “Taking, damaging or destroying property 
for public use,” does not mention bodily injury or death. Tex. Const. art. I, § 
17. It refers only to property, granting the government the legal right 
to take property for a public purpose with the corresponding obligation to pay 
for it. Thus, the “State, in the exercise of its sovereign power, has the 
unquestioned right to take, damage, or destroy private property for public use,” 
State v. Hale, 146 S.W.2d 731, 736 (Tex. 1941), but the constitution does not 
authorize the state to kill or cause bodily injury when doing so. Government 
actions that cause death or personal injury are neither validated, nor 
compensated, as the lawful exercise of the State’s eminent domain authority. 
Such actions may be subject to other types of lawsuits, but they are not the 
basis for liability under the takings clause of our constitution. 1 George D. Braden, et al., The Constitution of 
the State of Texas: An Annotated and Comparative 
Analysis 63 (1977).
            
I accordingly agree with the Court that the Pollocks cannot recover under Article I, Section 17 because 
there is no evidence that the City intended a taking, and, apart from that, no 
basis for the award of personal injury damages even had the City intended to 
damage the Pollocks’ property.
            
            
            
            
            
            
            
            
           III
            
Although the Pollocks do not have a takings 
claim, they have also asserted a negligence claim, raising the issue of whether 
the Tort Claims Act applies here to waive the City’s governmental immunity. 
See Tex. Civ. Prac. & Rem. Code §§ 
101.001-.109. The Tort Claims Act provides a limited waiver 
of governmental immunity “when personal injury or death is caused by a ‘use of 
tangible personal or real property if the governmental unit would, were it a 
private person, be liable to the claimant according to Texas law.’” Texas 
A&M Univ. v. Bishop, 156 S.W.3d 580, 583 
(Tex. 2005) 
(quoting Tex. Civ. Prac. & Rem. Code § 
101.021(2)). Neither the court of appeals nor this Court 
has considered this issue, albeit for different reasons. The court of appeals, 
having concluded that the Texas Constitution authorized the Pollocks’ claims, found application of the Tort Claims Act 
unnecessary. 155 S.W.3d 322, 332-33. This Court, on the 
other hand, renders any waiver under the Act irrelevant by concluding there is 
no evidence that the City’s negligence caused Sarah’s leukemia. Because I 
disagree with both conclusions, I turn now to the arguments on this issue.
            
The City argues that the Tort Claims Act does not apply in this case 
because the Pollocks failed to establish a claim 
within its narrow waiver of immunity. The City’s argument focuses on the court’s 
charge that asked the jury (1) whether the “negligence, if any, of the City of 
San Antonio 
proximately caused the occurrence or injury in question” and (2) whether the 
City’s “operation of the West Avenue Landfill constituted a nuisance” as that 
term was defined in the charge. The jury answered yes to both questions. The 
City objected to the charge, arguing that the case should be submitted as a 
premises liability case rather than as a case of general negligence and 
nuisance. The City submits that this charge error is fatal to the Pollocks’ claim of waiver under the Act. I disagree.
            
“Premises liability is the body of law that [defines] the duties owed by 
an owner or occupier of land to persons who come onto his or her real property 
to protect them from injury on account of dangerous conditions or activities on 
the property.” 19 
William V. Dorsaneo III, 
Texas Litigation Guide § 310.01[1] at 310-6 (2009). 
It is not a separate species of tort but rather a branch of the law of 
negligence that categorizes duty in relation to the plaintiff’s purpose for 
entering the property, that is, as an invitee, licensee, or trespasser. Western Invs., Inc. v. Urena, 162 S.W.3d 547, 550 (Tex. 2005). A 
premises liability case requires that the jury be instructed on the elements of 
the landowner’s duty and thus the distinction between general negligence and 
premises liability remains important in Texas. See Clayton W. Williams, Jr., Inc. 
v. Olivo, 952 S.W.2d 523, 529 (Tex. 1997) (rule stated in context of general 
contractor's liability for negligence of subcontractor); see also Nixon v. 
Mr. Prop. Mgmt. Co., 690 S.W.2d 546, 551 (Tex. 1985) (Kilgarlin, J., concurring) 
(suggesting that modern trend is “away from basing a landowner's liability on 
his visitor’s artificially determined purpose of entry”).
            
By definition then a premises liability case involves an injury on the 
defendant’s premises. But Sarah Pollock was not injured on the City’s property; 
she became ill at her own home, allegedly because of the City’s negligent use 
and management of the neighboring landfill. The duty owed by the City under 
these circumstances is not dependent on Sarah’s status as an invitee, licensee, 
or trespasser, and thus the Pollocks’ claim is not a 
premises liability case. The duty here instead rests on the City’s obligation 
not to contaminate adjoining private property with its waste disposal operations 
at the West Avenue Landfill.
            
The jury found that the City’s operation of the landfill was both 
negligent and a nuisance. Although there was not evidence that the nuisance rose 
to the level of a taking, there was evidence that the City’s negligence was a 
cause of the nuisance created by the landfill. We have said that personal injury 
damages may be recovered under these circumstances. See 
Vann v. Bowie Sewerage Co., 90 S.W.2d 561, 563 
(Tex. 1936) (nuisance created by private sewage 
company sickening neighboring property owner); City of Fort Worth v. 
Crawford, 12 S.W. 52, 54 (Tex. 1889) (nuisance 
created by operation of garbage dump causing illness). 
Moreover, this Court and others have recognized that an owner or occupier’s 
negligence on its own property may lead to liability for injuries suffered on 
adjoining property.[7]
            
I conclude then that the negligent operation of a landfill that causes a 
neighbor to become ill on her adjoining property is a condition or use of 
property causing personal injury within the contemplation of the Tort Claims 
Act. See Tex. Civ. Prac. & 
Rem. Code § 101.021(2) (governmental unit of the State may be liable for 
personal injury or death caused by a condition or use of tangible personal or 
real property if a private person would be liable under Texas law). The Tort 
Claims Act, however, limits the State’s liability for the bodily injury or death 
of a person to the “maximum amount of $250,000.” Tex. Civ. Prac. & Rem. 
Code § 101.023(a). I 
therefore would modify the court of appeals’ judgment to reflect the $250,000 
cap imposed by the Tort Claims Act, and, as modified, affirm the judgment 
awarding damages for Sarah Pollock’s personal injury.
 
            
___________________________________________
            
David M. Medina
            
Justice
 
OPINION ISSUED: May 1, 2009






[1] 
Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 590 (1993); see also E.I. 
du Pont de Nemours & Co. v. Robinson, 923 
S.W.2d 549 (Tex. 1995).

[2] 
One observer has suggested that analytical gaps are of two types: “(1) the 
underlying data-facts gap, which focuses on material variances between the data 
underlying the expert opinion and the actual facts of the plaintiff's case; and 
(2) the methodology-conclusion gap, which focuses on whether the expert properly 
explains how the methodology was applied to the plaintiff’s facts in arriving at 
the conclusion.” Kimberly S. Keller, Bridging the Analytical Gap: The Gammill Alternative to 
Overcoming Robinson & Havner Challenges to Expert 
Testimony, 33 St. Mary’s L.J. 277, 310 (2002).

[3] 
The Court suggests that Ramirez concerned only a conclusory challenge, but the case also involved a 
reliability complaint. One significant issue in the case was when the left rear 
wheel on the Volkswagen came off its axle. Ramirez, 159 
S.W.3d at 902. Edward Cox, the plaintiff’s metallurgical expert at trial, 
testified that a defective bearing caused the wheel to separate from the axle. 
Id. at 
910. Cox “was not offered as an accident reconstructionist to help establish when . . . the 
defect caused the accident,” and the Court rejected his “limited opinions on the 
causation issue” as conclusory. Id. at 
910-11. When the Court says here that there was no objection, it is 
referring to Cox’s testimony. See ___ S.W.3d at ___ & n.27. 
Volkswagen objected to the testimony of Ronald Walker, the plaintiff’s accident 
reconstructionist, and that 
testimony was analyzed by the Court under “the standards of reliability.” 
Id. at 
904. The Ramirez 
Court concluded that Walker’s opinion was indeed unreliable because 
of a particular analytical gap in his analysis. Id. at 906. Thus, the trial court abused its discretion in 
admitting the testimony and erred in not sustaining Volkswagen’s 
objection.

[4] 
Kraft estimated the methane-benzene generation ratio by using the USEPA Landfill 
Gas Generation Model (LandGEM) version 2.01. The model 
was developed by the EPA’s Control Technology Center for estimating landfill gas 
emissions.

[5] 
In the concluding paragraphs of that report, Dr. Patel stated:
 
If one looks at Sarah’s chromosomal markers as mentioned 
above, the specific chromosomal aberrations noted and those detected in 
benzene-exposed workers are remarkably similar. There is aneuploidy, i.e.: > 46 chromosomes and specifically in 
benzene exposed workers there were trisomies in the G 
group of chromosomes as noted for Sarah, specifically for chromosomes: 7, 8, 9 
and 21. It should be noted that the association with childhood leukemia and 
benzene exposure has been reported from Holland, 
China, United States, Britain and Japan.
 
Particularly of parental exposure of solvents containing 
benzene, there is an increased risk of childhood leukemia. The odds ratio for 
parental benzene exposure was as high as 5.81. As mentioned above it was 
suggested benzene and its metabolites may cause genetic damage in germ cells, 
which are then passed on to the offspring and/or cause direct genetic damage in 
developing fetus following maternal exposure.
 
It also suggests that there is an increased likelihood 
of ALL when such an exposure occurs during the critical organogenesis phase if 
not as germ mutation. In-vitro experimentation using 
human leukemia cells HL60 and human lymphocytes following exposure to benzenetriol, a direct derivative of benzene, shows oxidated DNA damage. Similar DNA damage has also been shown 
to correlate in animal model systems. It has been mentioned that benzene is 
associated with acute myeloid leukemia; however, the overall data clearly does 
not indicate association limited to AML but also to ALL.
Thus, after reviewing the literature and Sarah’s case, 
per se, it is in my medical opinion that there is reasonable medical and 
scientific certainty and probability of linking maternal exposure to benzene, 
organic acids and hydrocarbons in the environment with the development of ALL in 
Sarah Pollock.

[6] 
The Court’s indiscriminate mixing of unreliable and conclusory expert opinions is most apparent in its reliance 
on Exxon Corp. v. Makofski, 116 S.W.3d 176 
(Tex. App.–Houston [14th Dist.] 2003, pet. denied), a court of appeals’ opinion 
written by a current member of this Court, and Merrell Dow Pharms., Inc. v. Havner, 953 
S.W.2d 706 (Tex. 1997). In both cases, timely objections were made to the 
reliability of the respective experts. Justice Brister, writing for the 
Fourteenth Court of Appeals, observed that it was the defendant’s responsibility 
“to object at trial (which it did repeatedly) so the plaintiffs would have an 
opportunity to cure any defects regarding reliability and present us with a 
fully developed record.” Makofski, 116 S.W.3d at 
180-81 (citations omitted). Having preserved its complaint, the court of 
appeals subsequently concluded that the expert’s testimony was unreliable and 
thus no evidence because “[n]o epidemiological study established a statistically 
significant doubling of the risk of ALL from exposure to benzene” as required by 
Havner. See id. at 188. This Court then concludes that “[f]or the same 
reasons, we reach the same conclusion here.” ___ S.W.3d at 
___. But this case is not Makofski or 
Havner as the City conceded during oral 
argument, stating: “We cannot go into the statistical significant part of Havner because we did not object to the scientific 
reliability, we didn’t make a Daubert objection 
and we have not tried to do that.” Thus, the Court’s conclusion is based on an 
authority the City has expressly conceded does not apply.

[7] 
See, e.g., Alamo Nat’l Bank v. Kraus, 616 S.W.2d 908, 910–911 (Tex. 1981) 
(owner or occupier liable for injury caused by debris falling across public 
street from building being demolished); Atchison v. Tex. & P. Ry. Co., 186 S.W.2d 228, 229 (Tex. 1945) (duty breached 
when smoke from a grass fire on the defendant’s premises reached an adjacent 
public highway, causing a collision); Texas & P. Ry. Co. v. Brandon, 183 S.W.2d 212, 214 (Tex. Civ. App.—Eastland 1944, writ ref’d) (duty to keep premises free of combustible materials 
to avoid fire that could spread to neighboring property); Skelly Oil Co. v. Johnston, 151 S.W.2d 863, 
863-67 (Tex. Civ. App.—Amarillo 1941, writ ref’d) (gasoline manufacturing plant liable for creating oil 
slick on adjoining highway); see also J. Hadley Edgar, Jr. & James B. Sales, 
Texas Torts & Remedies § 20.08, Liability for Losses Outside Property 
(2009).