

# NUMBER 13-11-00686-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

RIO GRANDE REGIONAL HOSPITAL, HCA
HEALTH SERVICES OF TEXAS, INC., D/B/A
RIO GRANDE REGIONAL HOSPITAL, ET AL.,                    Appellants,

v.

BELEM AYALA, INDIVIDUALLY AND AS
NEXT FRIEND OF HER MINOR DAUGHTER,
LONDON RIOS AND JUAN ANTONIO RIOS JR.,
INDIVIDUALLY,                                             Appellees.

## On appeal from the 370th District Court
## of Hidalgo County, Texas.

## MEMORANDUM OPINION

### Before Chief Justice Valdez and Justices Rodriguez and Garza
### Memorandum Opinion by Chief Justice Valdez

This is an interlocutory appeal from an order denying appellants' request for relief

under section 74.351(b) of the Texas Civil Practice and Remedies Code. *See* TEX. CIV.

PRAC. & REM. CODE ANN. § 51.014(a)(9) (West Supp. 2011); *id.* § 74.351(b) (West 2011).  We affirm.

## I. BACKGROUND

Appellees[1] brought healthcare liability claims against appellants, Jasmine Ignacio, R.N., and Rio Grande,[2] in connection with the hospitalization of London Rios in Rio Grande Regional Hospital.  At two weeks old, London was transferred from Renaissance Hospital to the pediatric intensive care unit ("PICU") at Rio Grande Regional Hospital for management of a medically-treatable rapid heartbeat.  Appellees alleged that, during London's stay in the PICU, her tracheostomy[3] tube became dislodged and that, during the response to the dislodgement, London was deprived of oxygen and suffered severe and permanent brain damage.

Specifically, appellees allege that when London was in the PICU, the PICU nurse, Nurse Ignacio, asked Belem Ayala, London's mother, to feed London.  London became fussy almost immediately, so Belem called Nurse Ignacio for help; however, Nurse Ignacio did not respond.  Belem attempted to comfort her child while urgently and repeatedly asking Nurse Ignacio for help.  She saw what appeared to be an air bubble beginning to develop under London's skin.  When Nurse Ignacio still did not respond, Belem began yelling at Nurse Ignacio to help her baby.  At this point, Nurse Ignacio left

---

[1] Appellees are Belem Ayala, individually and as next friend of her minor daughter London Rios, and Juan Antonio Rios, Jr., individually.

[2] We use "Rio Grande" to refer collectively to Rio Grande Regional Hospital, HCA Health Services of Texas, Inc., d/b/a Rio Grande Regional Hospital, Columbia Rio Grande Healthcare, L.P., d/b/a Rio Grande Regional Hospital, and Rio Grande Regional Hospital, Inc., d/b/a Rio Grande Regional Hospital.

[3] The term "tracheostomy" refers to a surgically created hole through the front of the neck into the windpipe or trachea.  The term for the surgical procedure to create this opening is "tracheotomy."  The terms are commonly used interchangeably.

the nurse's station, and when she arrived at London's bedside, she saw that the infant was in severe distress.

The "air bubble" under London's skin was actually a subcutaneous air pocket that resulted from London's tracheostomy tube becoming dislodged. Nurse Ignacio panicked. She tried but failed to replace London's tracheostomy tube. She tried to suction the tube site, but she did not repeat the suction. She did not attempt to replace the tracheostomy tube with one of a smaller size. After approximately 30 minutes of attempting to resolve the situation on her own, Nurse Ignacio called a "code blue" and summoned the emergency response team, which was then able to resuscitate and stabilize the infant.

In addition to severe and permanent brain damage, London now suffers from seizures that cannot be controlled by medication, as well as spastic quadriparesis, a debilitating weakness in her arms and legs. London will never be able to work, care for herself, or manage her own affairs. She will require 24-hour a day medical care for the rest of her life.

Appellees sued Nurse Ignacio and Rio Grande, asserting six claims for negligence and breach of fiduciary duty, which appellees summarize as follows:

1. [Rio Grande] failed to provide properly trained and experienced PICU nurses to care for London;

2. [Appellants] failed to properly monitor London;

3. [Appellants] failed to provide the equipment London required;

4. [Nurse] Ignacio failed to timely intervene when London required nursing care;

5. [Nurse] Ignacio failed to properly respond once she suspected or discovered the displaced tracheostomy tube; and

3

6. [Nurse] Ignacio failed to timely [and] immediately initiate the emergency protocols London required.

Appellees also asserted claims for gross negligence, malicious injury to a child, and felony injury to a child. Appellees pleaded *respondeat superior* liability against Rio Grande, but also make allegations directly against the hospital.

Attached as exhibits to appellees' original petition were the expert reports and *curricula vitae* of Marguerite Fallon, R.N., M.S.N., and John Seals, M.D. Appellants objected to the adequacy of those reports, detailing their perceived deficiencies and failures to satisfy the requirements of section 74.351. In response, appellees filed an additional report and *curriculum vitae* from William Clark, M.D. Appellants also objected to this report as inadequate.

Appellees then filed supplemental reports from Drs. Seals and Clark. The supplemental reports retain the core of the original reports with some additional information provided. Appellants objected to the supplemental reports and filed motions to dismiss pursuant to section 74.351. Following a hearing, the trial court denied the motions to dismiss. This appeal ensued.

## II. ANALYSIS

By seven issues, which we will reorganize and address as one issue, *see* TEX. R. APP. P. 47.1., appellants complain that the trial court abused its discretion in denying their motions to dismiss appellees' claims because the three expert reports produced by appellants do not represent an objective good faith effort to comply with the definition of an expert report in subsection (r)(6) of Texas Civil Practice and Remedies Code section 74.351. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6), (l).

4

### A. Applicable Law

Chapter 74 of the Texas Civil Practice and Remedies Code entitles a defendant to dismissal of a healthcare liability claim if the defendant is not served, within 120 days of the date suit was filed, with an expert report showing that the claim has merit. *See id.* § 74.351(b).

#### 1. Expert Report

The report must provide a fair summary of the expert's opinions as of the date of the report regarding: (1) applicable standards of care; (2) the manner in which the care rendered by the healthcare provider failed to meet the standard of care; and (3) the causal relationship between that failure and the injury, harm, or damages claimed. *Id.* § 74.351(r)(6).

Identifying the standard of care is critical: "Whether a defendant breached his or her duty to a patient cannot be determined absent specific information about what the defendant should have done differently." *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 880 (Tex. 2001). "While a fair summary is something less than a full statement of the applicable standard of care and how it was breached, even a fair summary must set out what care was expected, but not given." *Id.*

A report's adequacy does not depend on whether the expert uses any particular "magical words." S*ee Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 53 (Tex. 2002). The report can be informal in that the information in the report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial. *Palacios*, 46 S.W.3d at 879.

To avoid dismissal, the report must present an objective good faith effort to comply with these requirements. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(l). A "good faith effort" in this context simply means a report that does not contain a material deficiency. *Samlowski v. Wooten*, 332 S.W.3d 404, 409-10 (Tex. 2011). To constitute a good faith effort, the report must provide enough information to: (1) inform the defendant of the specific conduct the plaintiff has called into question; and (2) provide a basis for the trial court to conclude that the claims have merit. *Bowie*, 79 S.W.3d at 53.

To avoid dismissal, a plaintiff need not present evidence in the report as if it were actually litigating the merits. *Palacios*, 46 S.W.3d at 879. The report need not marshal all of the plaintiff's proof, but it must include the expert's opinion on each of the three elements: (1) standard of care; (2) breach; and (3) causal relationship. *Bowie*, 79 S.W.3d at 53. A report cannot merely state the expert's conclusions about these elements. *Id.* "Rather, the expert must explain the basis of his statements to link his conclusions to the facts." *Earle v. Ratliff*, 998 S.W.2d 882, 890 (Tex. 1999).

A claimant is not required to satisfy the expert-report requirement by serving a single expert report, but may satisfy the requirement by serving any number of different reports from separate experts, which when construed together, are adequate to meet the requirement of providing non-conclusory expert opinions on the elements of (1) standard of care; (2) breach; and (3) causal relationship:

> Notwithstanding any other provision of this section, a claimant may satisfy any requirement of this section for serving an expert report by serving reports of separate experts regarding different physicians or health care providers or regarding different issues arising from the conduct of a physician or health care provider, such as issues of liability and causation. Nothing in this section shall be construed to mean that a single expert must address all liability and causation issues with respect to all

6

physicians or health care providers or with respect to both liability and causation issues for a physician or health care provider.

TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(i).

### 2. Qualification as an Expert

An expert must establish that he is qualified to provide the opinions required by section 74.351(r)(6). *Id.* § 74.351(r)(5)(B). The qualifications must appear in the expert report and attached *curriculum vitae*; they cannot be inferred or provided by extrinsic evidence. *See Baylor College of Med. v. Pokluda*, 283 S.W.3d 110, 117 (Tex. App.—Houston [14th Dist.]) 2009, no pet.).

In order to qualify as an expert in a particular case, a physician need not be a practitioner in the same specialty as the defendant physician. *Kelly v. Rendon*, 255 S.W.3d 665, 674 (Tex. App.—Houston [14th Dist.] 2008, no pet.); *Blan v. Ali*, 7 S.W.3d 741, 745 (Tex. App.—Houston [14th Dist.] 1999, no pet.); *see also Broders v. Heise*, 924 S.W.2d 148, 153-54 (Tex. 1996). The test is whether the report and curriculum vitae establish the witness's knowledge, skill, experience, training, or education regarding the specific issue before the court that would qualify the expert to give an opinion on that particular subject. *Roberts v. Williamson*, 111 S.W.3d 113, 121 (Tex. 2003). Section 74.401 provides in pertinent part:

> (c) In determining whether a witness is qualified on the basis of training or experience, the court shall consider whether, at the time the claim arose or at the time the testimony is given, the witness:
>
> (1) is board certified or has other substantial training or experience in an area of medical practice relevant to the claim; and
>
> (2) is actively practicing medicine in rendering medical care services relevant to the claim.

7

TEX. CIV. PRAC. & REM. CODE ANN. § 74.401 (c).

## B.     Standard of Review

The denial of the motion to dismiss is reviewed for abuse of discretion.  *Jelinek v. Casas*, 328 S.W.3d 526, 539 (Tex. 2010).   The abuse of discretion standard also applies to the trial court's determination of whether a witness is qualified to opine in a health care liability case.  *Larson v. Downing*, 197 S.W.3d 303, 304 (Tex. 2006) (per curiam).

## C.     Discussion of Nurse Fallon's Report

Appellants have not challenged the qualifications of Nurse Fallon to provide expert opinions on the elements of standard of care and breach.  Nurse Fallon has been a registered nurse for more than 15 years.  She has a bachelor's degree in nursing, a master's of science degree in nursing, and is pursuing a doctorate in nursing practice. Nurse Fallon has spent her entire career working in the PICU in positions held by nurses such as Nurse Ignacio, as well as positions in which she supervised employees such as Nurse Ignacio.  She has served as a staff RN, a staff educator, a nurse manager, and as a director of women's and children's services for a hospital system. She has also taught the emergency nurse pediatric course in her hospital, as well as in the West Texas region.  She has spent her entire career caring for critically ill infants and children in PICUs and has cared for patients with tracheostomies, such as London's.

### 1.  Standard of Care

Appellants complain that Nurse Fallon's report contains the following statements of "generic, overarching" standards of care, which according to appellants, are

8

"unfounded, 'stock' standards" and "meaningless surplusage" and "contribute nothing to the process but obfuscation": (1) "[A] PICU must provide definitive care for a wide range of complex, progressive, and rapidly changing medical, surgical, and traumatic disorders occurring in pediatric patients of all ages"; and (2) "The standard of care requires that a pediatric patient in a PICU be kept in an environment that is safe and appropriate to the specific physical, psychosocial, emotional, and spiritual needs of the patient with a life threatening condition and the family unit."

According to appellants, these general statements do not accomplish the purpose of providing the trial court with the specific information required to make the threshold determination of whether appellees' claims have merit. As appellants see it, "They are akin to reciting the umbrella standard that a healthcare provider must do what an ordinarily prudent hospital [or nurse] would do under the same or similar circumstances."

Although the statements quoted above are of a general nature, we conclude that it is inappropriate to read only selective portions of Nurse Fallon's report in isolation, as appellants urge, because the adequacy of an expert report depends on *all* the content "contained within the four corners of the document." *See Benish v. Grottie*, 281 S.W.3d 184 (Tex. App.—Fort Worth 2009, pet. denied) ("When reviewing the adequacy of a report, the only information relevant to the inquiry is the information contained within the four corners of the document."); *see also Bowie*, 79 S.W.3d at 53 (explaining that "a report's adequacy does not depend on whether the expert uses any particular 'magical words'" and that "the only information relevant to whether a report represents a good-faith effort to comply with the statutory requirements is the report itself"). Accordingly,

9

we will read the report as a whole to determine whether Nurse Fallon has set forth adequate statements concerning the standards of care that apply to each of appellees' claims.

With regard to the standard of care for appellees' first claim (i.e., "that [Rio Grande] had a duty to provide properly trained and experienced PICU nurses to care for patients like London"), Nurse Fallon's report states, "The standard of care for a nursing staff working in a PICU should have Pediatric advanced life support (PALS) or an equivalent course maintained for competency." She continues, "An appropriately trained RN would . . . intervene[] based on clinical assessment findings and would . . . document[] findings in the nurse notes and responses to the patients to said interventions."

With regard to the standard of care for appellees' second claim (i.e., that both Nurse Igancio and Rio Grande "failed to properly monitor London"), Nurse Fallon's report provides that "severe airway obstruction in children requires that practitioners call early for advanced help." Nurse Fallon states that "[a]n appropriately trained RN would . . . intervene[] based on clinical assessment findings . . . ." Moreover, "findings [are to] be documented in the nursing notes and interventions [are to] be described." Finally, Nurse Fallon states that "[a] reasonable and prudent nurse would . . . realize[] the infant's critical assessment findings and initiate[] an emergency response immediately."

With regard to the standard of care for appellees' third claim (i.e., that "[appellants] failed to provide the equipment London required"), Nurse Fallon's report states that a PICU must "have suction catheters, tracheal intubation equipment, endo tracheal tubes of all sizes, and tracheotomy trays available in the PICU." Nurse Fallon's

10

report states specifically that when a PICU patient has a fresh tracheotomy, the PICU staff must keep "a replacement tracheostomy tube of the same size and one smaller at the bedside."

With regard to the standard of care for appellees' fourth claim (i.e., that "[appellants] failed to timely intervene when London required nursing care") and appellees' fifth claim (i.e., that "[Nurse] Ignacio failed to properly respond once she suspected or discovered the displaced tracheostomy tube"), Nurse Fallon's report sets forth the following standards:

> If a displaced tracheostomy tube is suspected, the standard of care requires bilateral auscultation of breath sounds, observation of chest rise and fall, and use of an exhaled $CO_2$ detector to assess for placement.

> The standard of care requires that obstructed tracheostomy tubes are suspected with decreased breath sounds bilaterally, or decreased chest rise and fall.

> The standard of care requires that saline be injected into the tracheostomy tube to thin secretions, then a properly sized suction catheter be passed into the tube and suction is applied to clear secretions from the tracheostomy tube.

> The standard of care for nursing requires that if the obstruction is still present, you shall repeat this procedure one time after attempting ventilation between attempts.

> If there is no improvement in respiratory distress, the tracheostomy tube will be changed immediately.

> The standard of care requires that if a tracheostomy tube does not pass easily, the attempt shall be made immediately with a smaller sized tube to re-establish an airway.

> After the tube is placed, assessing placement of the tube with at least two confirmatory measures such as listening to breath sounds, visualization of equal rise and fall of chest, and use of $CO_2$ detector shall be documented by the RN.

11

The standard of care for severe airway obstruction in children requires that practitioners call early for advanced help.

A reasonable and prudent nurse . . . [is required to] realize[] the infant's critical assessment findings and initiate[] an emergency response immediately.

With regard to the standard of care for appellees' sixth claim (i.e., that "[Nurse] Ignacio failed to timely initiate the emergency protocols that London required"), Nurse Fallon's report states that "[t]he standard of care for severe airway obstruction in children requires that practitioners call early for advanced help" and that "[a] reasonable and prudent nurse . . . [is required to] realize[] the infant's critical assessment findings and initiate[] an emergency response immediately."

We conclude that the specific information provided by Nurse Fallon in her report is a fair summary sufficient for determining whether appellants breached their duties to London Rios. *See Palacios*, 46 S.W.3d at 880 ("[A] fair summary is something less than a full statement of the applicable standard of care and how it was breached . . . ."). Nurse Fallon's report sets forth specific information about what was expected from appellants under the circumstances presented in this case. *See id.* ("[A] fair summary must set out what care was expected, but not given."). By providing this detailed information about the applicable standards of care, Nurse Fallon's report advises appellants of the specific conduct appellees have called into question. *See Bowie*, 79 S.W.3d at 53. Accordingly, we conclude that the trial court did not abuse its discretion in denying appellants' motions to dismiss insofar as the motions sought dismissal on the basis that Nurse Fallon's report "does not represent an objective good faith effort to comply with the definition of an expert report in Subsection (r)(6)" with regard to the element of standard of care. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(l), (r)(6).

## 2. Breach

Next, appellants complain that Nurse Fallon's report fails to represent an objective good faith effort to comply with the definition of an expert report in Subsection (r)(6) with regard to the element of breach of the standard of care. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6). According to appellants, Nurse Fallon's report sets forth several purported standards of care that she never opines were breached. Specifically, appellants complain about the following portion of Nurse Fallon's report:

> The standard of care for a nursing staff working in a PICU should have Pediatric advanced life support (PALS) or an equivalent course maintained for competency. The nursing staff should have an established program for nursing orientation, yearly competency review of high-risk, low frequency therapies, core competencies based on patient population, and ongoing educational programs specific for pediatric critical care nursing. All nurses working in a PICU should complete a clinical and didactic pediatric critical care orientation before assuming full responsibility for patient care.

Appellants complain that, in her list of alleged breaches of the standard of care, Nurse Fallon does not assert the breach of any of these standards. For example, appellants argue that Nurse Fallon does not opine that Nurse Ignacio failed to have "PALS or an equivalent course maintained for competency." In addition, appellants contend that Nurse Fallon does not opine that Rio Grande nursing staff lacked "an established program for nursing orientation" or that Nurse Ignacio failed to "complete a clinical or didactic pediatric critical care orientation."

According to appellants, the "orphaned" standards of care recited in Nurse Fallon's report cannot be considered in determining whether the report demonstrates a good faith effort to comply with the report requirements regarding breach of the standards of care. We conclude that Nurse Fallon's report sets forth adequate

13

statements concerning breaches of the standards of care that apply to each of appellees' claims.

With regard to appellees' first claim (i.e., "that [Rio Grande] had a duty to provide properly trained and experienced PICU nurses to care for patients like London"), Nurse Fallon's report states that there was a breach of the applicable standard of care because "an appropriately trained RN would have intervened based on clinical assessment findings and would have documented findings in the nurse notes and responses of the patient to the said interventions."  In addition, as appellees point out, Nurse Fallon's report states that Nurse Ignacio failed to properly monitor London because "as clinical deterioration was documented, there is an absence of airway interventions described by the RN caring for the child."

With regard to appellees' second claim (i.e., "that both [appellants] failed to properly monitor London), Nurse Fallon's report explains that the standard of care was breached when "[Nurse] Ignacio failed to act upon the airway emergency of the infant for a minimum of 15 minutes and up to 30 minutes from the time of critical determination to cardiac arrest and initiation of code."  Nurse Fallon's report also explains that the standard of care was breached when Nurse Ignacio "failed to immediately call for physician assistance when the airway obstruction in this infant [London] was realized."

With regard to appellees' third claim (i.e., that "[appellants] failed to provide the equipment London required"), Nurse Fallon's report explains that the standard of care was breached when Nurse Ignacio failed to have "at her disposal a replacement tracheostomy tube of the same size as the one placed in the operating room, and a size smaller at the bedside of this infant on 1/30/09."

14

With regard to appellees' fourth claim (i.e., that "[appellants] failed to timely intervene when London required nursing care"), Nurse Fallon's report explains that the applicable standard of care was breached when Nurse Ignacio failed to take any "confirmatory measures such as C02 detector usage." According to Nurse Fallon's expert report, the standard of care was breached when "repeated suctioning of the tracheostomy tube was not performed, nor was an attempt made to replace the tube with a smaller sized tracheostomy tube." Furthermore, the standard of care was breached when Nurse Ignacio "failed to immediately call for physician assistance when airway obstruction in this infant was realized." Nurse Fallon explains that the standard of care was breached when Nurse Ignacio "failed to act upon the airway emergency of the infant for a minimum of 15 minutes and up to 30 minutes from the time of critical determination to cardiac arrest and initiation of code."

With regard to appellees' fifth claim (i.e., that "[Nurse] Ignacio failed to properly respond once she suspected or discovered the displaced tracheostomy tube"), Nurse Fallon's report states that Nurse Ignacio breached the applicable standard of care when she failed to properly respond once she suspected or discovered the displaced tracheostomy tube. Specifically, she opines that Nurse Ignacio breached the applicable standard of care when "[n]o confirmatory measures such as C02 detector usage was documented." Nurse Fallon explains that Nurse Ignacio failed to perform "repeated suctioning of the tracheostomy tube." Furthermore, there was no "attempt made to replace the tube with a smaller sized tracheostomy tube." Nurse Fallon opines that Nurse Ignacio breached the applicable standard of care when she "failed to immediately call for physician assistance when airway obstruction in this infant was realized." Nurse

15

Fallon explains that the standard of care was breached when Nurse Ignacio "failed to act upon the airway emergency of the infant for a minimum of 15 minutes and up to 30 minutes from the time of critical determination to cardiac arrest and initiation of code."

With regard to appellees' sixth claim (i.e., that "[Nurse] Ignacio failed to timely initiate the emergency protocols that London required"), Nurse Fallon's report states that Nurse Ignacio breached the applicable standard of care when she "failed to immediately call for physician assistance when airway obstruction in this infant was realized."

We conclude that the specific information provided by Nurse Fallon is sufficient to provide a basis for determining whether appellants breached their duties to London Rios. *See Palacios*, 46 S.W.3d at 880 ("[A] fair summary is something less than a full statement of the applicable standard of care and how it was breached . . . ."). Nurse Fallon's report sets forth specific information about what care was expected from appellants, but not given. *See id.* ("[A] fair summary must set out what care was expected, but not given."). By providing this detailed information about the breaches of the applicable standards of care, Nurse Fallon's report advises appellants of the specific conduct appellees have called into question and what appellants should have done differently. *See Bowie*, 79 S.W.3d at 53. Accordingly, we conclude that the trial court did not abuse its discretion in denying appellants' motions to dismiss insofar as the motions sought dismissal on the basis that Nurse Fallon's report "does not represent an objective good faith effort to comply with the definition of an expert report in Subsection (r)(6)" with regard to the element of breach of the applicable standards of care. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(l), (r)(6).

16

### 3. *Causation*

Finally, with regard to the element of causation, the last remaining requirement for an expert report under Chapter 74, appellants complain that Nurse Fallon, as a non-physician, is categorically unqualified to provide an expert opinion. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.403(a) (West 2011) ("[I]n a suit involving a health care liability claim against a physician or health care provider, a person may qualify as an expert witness on the issue of the causal relationship between the alleged departure from accepted standards of care and the injury, harm, or damages claimed *only if the person is a physician* and is otherwise qualified to render opinions on that causal relationship under the Texas Rules of Evidence.") (emphasis added). Appellees agree that non-physicians are not qualified to provide opinions regarding causation. *See HealthSouth of Houston, Inc. v. Parks*, 329 S.W.3d 885, 889 (Tex. App.—Beaumont 2010, no pet.) ("From this provision it follows that a nurse is not statutorily qualified to provide an expert report on the issue of causation in a health care liability claim.").

In addition to arguing that Nurse Fallon, as a non-physician, is categorically unqualified from opining on causation, appellants also contend that the causation opinions in Nurse Fallon's report are entirely conclusory because she "uses generalities and does not connect the alleged breaches to the alleged injuries." Instead, according to appellants, "she simply opines that the breach caused the injury." *See Jelinek*, 328 S.W.3d at 539-40 ("An expert cannot simply opine that the breach caused the injury.").

We conclude that, because Nurse Fallon is a non-physician, her report does not satisfy the requirement of an expert report summarizing the causal relationship between the breaches of the applicable standards of care and the injuries, harm, and damages

17

alleged by appellees. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6). Although the trial court denied appellants' motions to dismiss, which argued, *inter alia*, that Nurse Fallon's report did not represent a good faith effort to provide an expert report summarizing the causal relationship between the breaches of the applicable standards of care and the injuries, harm, and damages claimed, it is does not necessarily follow that the trial court concluded that Nurse Fallon's report was adequate on the element of causation or that the trial court abused its discretion in denying the motions to dismiss. *See Wall v. Parkway Chevrolet, Inc.*, 176 S.W.3d 98, 104 (Tex. App.—Houston [1st Dist.] 2004, no pet.) ("A trial court abuses its discretion only if the record (1) clearly shows that the trial court misapplied the law to the established facts, (2) does not reasonably support the ruling, or (3) shows that the trial court acted arbitrarily or unreasonably."). In order to establish that the trial court abused its discretion by denying the motions to dismiss, appellants are required to establish that neither of the other two expert reports proffered by appellees represented a good faith effort to provide an expert report on causation. *See id.*

Accordingly, we will examine the expert reports of Drs. Clark and Seals to determine whether they constitute a good faith effort to provide an expert report on causation. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(i) (permitting claimants to use separate reports from different experts to meet the requirement of providing an expert report on (1) standard, (2) breach, and (3) causation).

### D. Discussion of Dr. Clark's Report

Dr. Clark is board certified in otolaryngology, the area of medical practice concerned with the ear, nose, and throat. He is a professor of otolaryngology and a

18

practicing pediatric otolaryngologist. In addition to his experience as an ear, nose, and throat doctor, Dr. Clark's *curriculum vitae* indicates that he also has experience as the Chairman of the Department of Surgery at Lyster Army Hospital. In his expert report, Dr. Clark explained that he regularly performs tracheotomies on infants and children and that, in his practice, he depends on members of the PICU to care for postoperative patients like London. Dr. Clark also states in his expert report that he has experience treating patients like London who have had their tracheostomy tubes dislodged and have suffered brain damage caused by a lack of oxygen as a result.

### 1. Standard of Care

Appellants complain that Dr. Clark's report is inadequate on the standard-of-care element, for which we have already concluded Nurse Fallon's report is adequate. Nevertheless, out of abundance of caution and to ensure we have adequately addressed all issues raised by appellants that are necessary for final disposition of this appeal and provided the basic reasons for our decision, we will address appellants' complaints about the statements of the standards of care in Dr. Clark's report. *See* Tex. R. App. P. 47.1.

Appellants complain that Dr. Clark's report contains the following statements of "generic, overarching" standards of care, which according to appellants, are "unfounded, 'stock' standards" and "meaningless surplusage" and "contribute nothing to the process but obfuscation": (1) "[T]he PICU provide a safe environment for the infant and be ready to initiate emergency measures should the need arise"; (2) "[T]he PICU staff [must] be trained to understand the risk of tube displacement in order to minimize the risk of its occurring and to manage the patient should it occur"; and (3) "The PICU

19

staff must have a 'plan,' which is 'appropriate protocols in place in a reasonable and prudently operated PICU.'"

According to appellants, these general statements "do not provide specific information about the particular conduct at issue that is the essence and purpose of the section 74.351 expert report." "Instead," appellants say, "they amount to no more than stating the healthcare provider did not take sufficient precautions to avoid the injury to the patient." As appellants see it, "Because [these] statements of generic standards of care do not assist the courts in determining whether [appellees'] claims are frivolous, they contribute nothing toward the statutory report requirements."

We disagree with appellants' assertion that Dr. Clark's expert report is inadequate to provide a fair summary of the standard-of-care element.

With regard to the standard of care for appellees' first claim (i.e., "that [Rio Grande] had a duty to provide properly trained and experienced PICU nurses to care for patients like London"), Dr. Clark opines that the standard of care required the following:

[1]     [W]hen an infant with a fresh tracheostomy tube is sent to a PICU, that PICU must provide a safe environment for the infant and be ready to initiate emergency measures should the need arise.

[2]     All measures involving the patient must consider the possibility of accidental dislodgment of the tube and be done in such a way to minimize such risks.

[3]     [PICU staff must] be trained to understand the risk of tube displacement in order to minimize the risk of its occurring and to manage the patient should it occur.

[4]     [Part of the PICU's plan] must provide for careful handling of the patient, close monitoring of the patient to plan for immediate recognition of the tracheostomy tube being displaced, and several plans for securing the airway should accidental dislodgment occur.

20

[5]     With any deterioration in the patient's condition, or when a patient exhibits signs and symptoms of respiratory distress as London Rios did, dislodgment or obstruction of the tube must be considered as the possible cause, even if external parts of the tube visually appear to be normally positioned.

[6]     When a tracheostomy tube becomes displaced or obstructed and there is a deterioration in the patient's condition, all applicable professional help must be immediately mobilized to remove any obstruction or correct any dislodgment.  This must include immediate contact of the physician in attendance and the surgeon who placed the tracheostomy and immediate initiation of emergency code procedures.

[7]     A tracheostomy tube of the same type and size as the one used, plus one of size smaller must be at the bedside.  An obturator for the tube in place must be placed at the bedside in a highly visible location.

[8]     The PICU team must understand that a tracheostomy tube should never be subjected to being bag ventilated unless it is known to be in the trachea.

With regard to the standard of care for appellees' second claim (i.e., that "both [appellants] failed to properly monitor London"), Dr. Clark's report states that the applicable standard of care required that appellants "provide a safe environment for the infant and be ready to initiate emergency measures should the need arise."  In addition, PICU staff must "plan for immediate recognition of the tracheostomy tube being displaced, and several plans for securing the airway should accidental dislodgment occur."  Dr. Clark also states that "[w]ith any deterioration in the patient's condition, or when a patient exhibits signs and symptoms of respiratory distress as London Rios did, dislodgment or obstruction of the tube must be considered as the possible cause, even if external parts of the tube visually appear to be normally positioned."

With regard to the standard of care for appellees' third claim (i.e., that "[appellants] failed to provide the equipment London required"), Dr. Clark's report states

21

that "[a] tracheostomy tube of the same type and size as the one used, plus one of one size smaller must be at the bedside." He also states, under the applicable standard of care, the PICU staff were required to have "several plans for securing the airway should accidental dislodgment occur."

With regard to the standard of care for appellees' fourth claim (i.e., that "[appellants] failed to timely intervene when London required nursing care"), Dr. Clark's reports states that "[w]ith any deterioration in the patient's condition, or when a patient exhibits signs and symptoms of respiratory distress as London Rios did, dislodgment or obstruction of the tube must be considered as the possible cause, even if external parts of the tube visually appear to be normally positioned." Furthermore, "[w]hen a tracheostomy tube becomes displaced or obstructed and there is a deterioration in the patient's condition, all applicable professional help must be immediately mobilized to remove any obstruction or correct any dislodgment. This must include immediate contact of the physician in attendance and the surgeon who placed the tracheostomy and immediate initiation of emergency code procedures."

With regard to the standard of care for appellees' fifth claim (i.e., that "[Nurse] Ignacio failed to properly respond once she suspected or discovered the displaced tracheostomy tube"), Dr. Clark's report states that "[w]hen a tracheostomy tube becomes displaced or obstructed and there is a deterioration in the patient's condition, all applicable professional help must be immediately mobilized to remove any obstruction or correct any dislodgment. This must include immediate contact of the physician in attendance and the surgeon who placed the tracheostomy and immediate initiation of emergency code procedures."

22

With regard to the standard of care for appellees' sixth claim (i.e., that "[Nurse] Ignacio failed to timely initiate the emergency protocols that London required"), Dr. Clark's report states that "[w]hen a tracheostomy tube becomes displaced or obstructed and there is a deterioration in the patient's condition, all applicable professional help must be immediately mobilized to remove any obstruction or correct any dislodgment. This must include immediate contact of the physician in attendance and the surgeon who placed the tracheostomy and immediate initiation of emergency code procedures."

We conclude that the specific information provided by Dr. Clark's report is a sufficient basis for determining whether appellants breached their duties to London Rios. *See Palacios*, 46 S.W.3d at 880 ("[A] fair summary is something less than a full statement of the applicable standard of care and how it was breached . . . ."). Dr. Clark's report sets forth specific information about what was expected from appellants under the circumstances presented in this case. *See id.* ("[A] fair summary must set out what care was expected, but not given."). By providing this detailed information about the applicable standards of care, Dr. Clark's report advises appellants of the specific conduct appellees have called into question. *See Bowie*, 79 S.W.3d at 53. Accordingly, we conclude that the trial court did not abuse its discretion in denying appellants' motions to dismiss insofar as the motions sought dismissal on the basis that Dr. Clark's report "does not represent an objective good faith effort to comply with the definition of an expert report in Subsection (r)(6)" with regard to the element of standard of care. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(l), (r)(6).

### 2. Breach

Appellants complain that Dr. Clark's report is inadequate on the element of breach of the standard of care, for which we have already concluded Nurse Fallon's report is adequate. To ensure we address all issues raised and necessary for final disposition of this appeal, we will nonetheless address appellants' complaints about the statements in Dr. Clark's report concerning breaches of the applicable standards of care. *See* TEX. R. APP. P. 47.1.

Appellants complain that Dr. Clark's report sets forth several purported standards of care that he never opines were breached. Appellants complain that "Dr. Clark opines that 'PICU staff [must] be trained to understand the risk of tube displacement,' but he never opines that Rio Grande's PICU staff or Nurse Ignacio was not so trained." Appellants also fault Dr. Clark's report because "he contends that PICU staff must have a 'plan,' which he generically defines as including 'both reasonable and prudent nursing protocols as more specifically described in this report and Nurse Fallon's report, as well as implementation of any and all physician's orders provided upon the patient's arrival in the PICU setting,'" "but he never opines that Nurse Ignacio or Rio Grande failed to have a plan in place."

According to appellants, the "orphaned" standards of care recited in Dr. Clark's report cannot be considered in determining whether the report demonstrates a good faith effort to comply with the report requirements regarding standards of care.

Appellants also complain that, "[i]n addition to opining on several standards of care that he never alleges were breached, Dr. Clark reverses course and opines about several breaches that are not linked to any purported standard of care." For example,

24

appellants fault Dr. Clark because "he opines that 'PICU staff' breached the standard of care by allowing London Rios to be fed at the bedside by her mother[,] [b]ut nowhere in his report does he opine that the standard of care forbid bedside feeding of an infant by her mother." In addition, appellants fault Dr. Clark because "he opines that a breach occurred when 'there was a delay in recognition of the tracheostomy tube's becoming non-functional . . . [,] [b]ut his standard of care does not require immediate recognition of a tracheostomy tube's becoming non-functional." According to appellants, Dr. Clark merely states that, "[w]ith any deterioration in the patient's condition[,] dislodgment or obstruction of the [tracheostomy] tube must be considered as the possible cause."

We disagree with appellants' assertion that Dr. Clark's expert report is inadequate to provide a fair summary of the element of breach of the applicable standards of care.

With regard to appellees' first claim (i.e., "that [Rio Grande] had a duty to provide properly trained and experienced PICU nurses to care for patients like London"), Dr. Clark's report states that the applicable standard of care was breached when "[t]he infant was allowed, by the PICU staff at Rio Grande . . . , to be fed at bedside by her mother, who has no medical training and did not understand the risks of London being moved." He further opined that Rio Grande breached the standard of care because "there were no replacement tracheotomy tubes, at least one of the same size and at least one of a smaller size, at the patient's bedside." Dr. Clark also explains that Rio Grande breached the standard of care when Nurse Ignacio failed to "immediate[ly] recogni[ze] . . . the tracheostomy tube's becoming non-functional." Dr. Clark explains that the standard of care was further breached when "[t]here was a significant delay,

25

rather than immediately mounting a response to a life threatening emergency." Specifically, in the opinion of Dr. Clark, the standard of care was breached when Nurse Ignacio failed "to immediately initiate the code." Finally, Dr. Clark opines that the standard of care was breached when "[t]he tracheostomy tube was subjected to vigorous bag ventilation without insuring its proper position in the trachea, thus producing bilateral pneumonthoracies." We agree with appellees that these statements demonstrate Dr. Clark's opinion that Nurse Ignacio was not properly trained or adequately experienced when she instructed Belem to feed London and mishandled the emergency that was created as a result.

With regard to appellees' second claim (i.e., "that both [appellants] failed to properly monitor London), Dr. Clark's report states that the applicable standard of care was breached when Nurse Ignacio "delay[ed] recognition of the tracheostomy tube's becoming non-functional, be it from tip displacement or obstruction." According to Dr. Clark's report, "[o]nce the emergency occurred, there was unacceptable delay in recognition of the source of the patient's deterioration and a very slow response to the emergency."

With regard to appellees' third claim (i.e., that "[appellants] failed to provide the equipment London required"), Dr. Clark's report states that the applicable standard of care was breached when "there were no replacement tracheotomy tubes, at least one of the same size and at least of a size smaller, at the patient's bedside."

With regard to appellees' fourth claim (i.e., that "[appellants] failed to timely intervene when London required nursing care"), Dr. Clark's report states that the applicable standard of care was breached when "[t]here was delay, rather than

immediate recognition of the tracheostomy tube's becoming non-functional, be it from tip displacement or obstruction." According to Dr. Clark's expert report, the breach of the applicable standard of care occurred when "[t]here was a significant delay, rather than immediately mounting a response to the life threatening emergency." Again, Dr. Clark states in his report that the standard of care was breached by the "[f]ailure to immediately initiate the code." Elsewhere in the report, Dr. Clark opines that "[o]nce the emergency occurred, there was unacceptable delay in recognition of the source of the patient's deterioration and a very slow response to the emergency."

With regard to appellees' fifth claim (i.e., that "[Nurse] Ignacio failed to properly respond once she suspected or discovered the displaced tracheostomy tube"), Dr. Clark states that a breach of the applicable standard of care occurred when "[t]here was delay, rather than immediate recognition of the tracheostomy tube's becoming non-functional, be it from tip displacement or obstruction." He explains that "[t]here was a significant delay, rather than immediately mounting a response to the life threatening emergency." Again, Dr. Clark states in his report that the standard of care was breached by the "[f]ailure to immediately initiate the code." According to Dr. Clark, a breach of the standard occurred because "[o]nce the emergency occurred, there was unacceptable delay in recognition of the source of the patient's deterioration and a very slow response to the emergency."

With regard to appellees' sixth claim (i.e., that "[Nurse] Ignacio failed to timely initiate the emergency protocols that London required"), Dr. Clark's report states that there was a breach of the applicable standard of care when "[t]here was delay, rather than immediate recognition of the tracheostomy tube's becoming non-functional, be it

27

from tip displacement or obstruction." Furthermore, "[t]here was a significant delay, rather than immediately mounting a response to the life threatening emergency." According to Dr. Clark, Nurse Ignacio breached the standard of care by her "[f]ailure to immediately initiate the code."

We conclude that the specific information provided by Dr. Clark's report is a sufficient basis for determining whether appellants breached their duties to London Rios. *See Palacios*, 46 S.W.3d at 880. Dr. Clark's report sets forth specific information about what care was expected from appellants, but not given. *See id.* By providing this detailed information about the breaches of the applicable standards of care, Dr. Clark's report advises appellants of the specific conduct appellees have called into question and what appellants should have done differently. *See Bowie*, 79 S.W.3d at 53. Accordingly, we conclude that the trial court did not abuse its discretion in denying appellants' motions to dismiss insofar as the motions sought dismissal on the basis that Dr. Clark's report "does not represent an objective good faith effort to comply with the definition of an expert report in Subsection (r)(6)" with regard to the element of breach of the applicable standards of care. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(l), (r)(6).

### 3. Causation

Finally, with regard to the element of causation, for which we concluded that Nurse Fallon's report was inadequate, appellants make a threefold attack on the adequacy of Dr. Clark's report, arguing the following: (a) Dr. Clark's report does not establish his qualifications to opine on causation; (b) Dr. Clark's report fails to link the

28

alleged breaches to the alleged injuries; and (c) Dr. Clark's report fails to address foreseeability.

a) Qualifications

In their challenge to Dr. Clark's qualifications, appellants point out that on the first page of his report, Dr. Clark discusses his purported qualifications to provide opinions in this case:

> As a result of my education, training, and experience, I have knowledge of and am familiar with the standards of care for the care and treatment of pediatric patients such as London Rios and therefore am qualified to render an expert opinion regarding such standards of care as they pertain to London Rios.

Appellants complain, "That statement tells us nothing about his qualification to testify with regard to causation. His choice to affirmatively state that he is qualified to opine on standards of care implies that he is not qualified to opine on other issues." According to appellants, "This missing qualification is not supplied by the rest of his report or his CV."

In response, appellees tell us that Dr. Clark's qualifications to opine on causation are supplied by his expert report and "his 22 page-long CV where he described his qualifications to render an expert report on breach and causation." Appellees draw our attention to Dr. Clark's experience treating patients who have had their tracheostomy tubes dislodged and have suffered brain damage caused by lack of oxygen as a result. According to appellees, "[t]hat experience qualifies him to provide an expert opinion linking London Rios' injuries to the failures by Nurse Ignacio and Rio Grande Regional Hospital to comply with the standard of care."

We agree with appellees. An expert is qualified to give opinion testimony about the causal relationship between the injury claimed and the alleged departure from the

applicable standard of care if he is "otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(5)(C), § 74.403(a). The Texas Rules of Evidence provide that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." TEX. R. EVID. 702; *see also Roberts v. Williamson*, 111 S.W.3d 113, 121-22 (Tex. 2003) (recognizing that while a medical license does not automatically qualify holder to testify as expert on every medical question, the test is not whether expert practices in a particular field of medicine, but rather whether offering party has established that expert has knowledge, skill, experience, training, or education regarding specific issue before court that would qualify expert to give opinion on particular subject and holding that based on qualifications and experience, pediatrician was qualified to opine on cause and effect of neurological injuries). We agree with appellees' assertion that Dr. Clark's qualifications to opine on causation are adequately supplied by his expert report and his 22-page *curriculum vitae*.

We conclude that the trial court did not abuse its discretion in determining that Dr. Clark was qualified by his knowledge, training, and experience to give opinion testimony on the issue of causation. *See Mem'l Hermann Healthcare Sys. v. Burrell*, 230 S.W.3d 755, 757 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (citing *Broders v. Heise*, 924 S.W.2d 148, 151-52 (Tex.1996)).

Next, appellants point out that, in his report, Dr. Clark "purports to offer causation opinions linking alleged breaches with, among other things, ischemic brain injury, and

30

severe neurological impairment." Appellants complain that Dr. Clark is a pediatric otolaryngologist, "not a neurologist or otherwise trained in brain injuries." Therefore, appellants contend, Dr. Clark has failed to establish that he is qualified to opine about the causes of brain and other neurological injuries.

In response, appellees note that there is no challenge being made to Dr. Clark's qualification to opine that the dislodgement of the tracheostomy tube stopped the delivery of air to London's lungs. As appellees see it, the challenge to Dr. Clark's qualification is essentially that Dr. Clark is not able to opine that a lack of oxygen to the brain caused London's brain damage. Appellees tell us, "Certainly a Fellow in the American College of Surgeons, the International College of Surgeons, the American Academy of Otolaryngology, and a Charter Member of the American Society of Pediatric Otolaryngology is qualified to provide an opinion that when London Rios was deprived of oxygen for a substantial period of time, that caused her [to suffer] brain damage."

We agree with appellees. Dr. Clark is qualified to give these opinions based on his knowledge, training, and experience, particularly his experience treating patients who have had their tracheostomy tubes dislodged and have suffered brain damage caused by lack of oxygen as a result. *See McKowen v. Ragston*, 263 S.W.3d 157, 164 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (holding that standard of care expert "is qualified to testify in an area, as here, in which [he] has knowledge, skill, training, and experience, and where the subject of the claim (here, an infection from an AV graft) falls squarely within his medical expertise").

We conclude that the trial court did not abuse its discretion in determining that Dr. Clark was qualified by his knowledge, training, and experience to give opinion testimony on the issue of causation. *See Mem'l Hermann Healthcare*, 230 S.W.3d at 757 (citing *Broders*, 924 S.W.2d at 151-52).

Finally, appellants complain that "Dr. Clark prefaces each of his causation opinions with the conclusory statement that the opinions are based generically on 'medical literature, studies, and my professional training and experience.'" Appellants say "that is far too general." For appellants, this "is not remedied by the reference that Dr. Clark 'has treated pediatric patients who have had tracheostomy tube dislodgment and subsequent hypoxic events.'" "This reference does not demonstrate his qualifications," according to appellants, because Dr. Clark failed to provide "any explanation of the timing of this treatment (i.e., before or after the 'subsequent hypoxic events') or the level of his involvement in that treatment."

We have already concluded that the trial court did not abuse its discretion in determining that Dr. Clark is qualified to opine on the issue of causation. Accordingly, we find no merit in appellants' complaint that Dr. Clark relied on medical literature, studies, and his professional training and experience in supplying his opinions on the issue of causation.

b) Link between Breach and Injury

Appellants complain that Dr. Clark's report fails to link the alleged breaches to the alleged injuries. In particular, appellants complain about Dr. Clark's opinion that PICU staff breached the standard of care because "the displaced tracheostomy tube was subjected to vigorous bag ventilation without insuring its proper position in the

trachea, thus producing bilateral pneumonthoracies." Appellants complain that Dr. Clark failed to opine that this breach "proximately caused any of the alleged injuries." It is not enough, according to appellants, that Dr. Clark makes the "global statement" that "as a result of [what appellants call] the ["unspecified"] breaches of the standard of care by the PICU staff, London Rios was deprived of oxygen for a substantial period of time resulting in cardiopulmonary arrest." According to appellants, "Dr. Clark was required to, but did not, explain how any particular breach deprived London Rios of oxygen for a substantial period of time."

According to appellants, "It is not sufficient for Dr. Clark to state his conclusions about causation without explaining how or why each alleged breach links to the alleged injuries." Appellants say, "The 'how' and 'why' are missing entirely from Dr. Clark's opinions on causation." Therefore, according to appellants, "His causation opinions do not present a good faith attempt to comply with the statutory requirements."

Appellees disagree. According to appellees, Dr. Clark reviewed 3,340 pages of the medical records from Rio Grande, including the discharge summary, respiratory care notes, physician orders, progress notes, nursing documentation, history and physical, radiology reports, laboratory reports, and consultant notes as well as the expert reports of Dr. Seals and Nurse Fallon. Dr. Clark notes that London's medical records show that London was exhibiting "circumoral cyanosis, mottled skin, and subcutaneous air of the head and upper chest" while she was intubated with a tracheostomy tube. Dr. Clark explains that those are recognized signs and symptoms of respiratory distress. Therefore, according to appellees, Dr. Clark linked his opinion to the conclusion that "[a]s a result of the breaches of [the] standard of care by the PICU

33

staff, London Rios was deprived of oxygen for a substantial period of time resulting in cardiopulmonary arrest." He further explains that London's "brain was deprived of needed oxygen for far too long for her to enjoy a favorable neurological outcome."

Dr. Clark states that this "chain of events would have been prevented by more careful handling of the patient." He states his opinion that "[h]ad Jasmin Ignacio, R.N. and Rio Grande . . . properly recognized the signs and symptoms of respiratory distress, immediately acted to check the patency of the tracheostomy tube, immediately called for physician assistance and initiated emergency code procedures . . . the resulting injuries to London Rios would not have occurred in all reasonable medical probability." According to Dr. Clark, "if the PICU nurse and Rio Grande had acted reasonably and prudently as set out in the above standard of care, or as set out in Nurse Fallon's report, London Rios would not have suffered the cardiopulmonary arrest, ischemic brain injury, and neurologic impairment." He describes his opinion that "the injuries to London Rios . . . were a direct result of the oxygen deprivation caused by the breaches as set out herein and in Nurse Fallon's expert report."

We disagree with appellants' assertion that Dr. Clark's report is merely conclusory on the issue of causation. *See Arkoma Basin Exploration Co. v. FMF Assocs. 1990-A, Ltd.*, 249 S.W.3d 380, 391 n.32 (Tex. 2008) (defining conclusory as "[e]xpressing a factual inference without stating the underlying facts on which the inference is based"). Contrary to what appellants have represented to this Court, Dr. Clark's report does link the departures from the applicable standards of care to the complained of injuries. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6). Among other things, his report plainly states "how" the injuries occurred: "the injuries to London

34

Rios . . . were a direct result of the oxygen deprivation caused by the breaches as set out herein and in Nurse Fallon's expert report."   His report also states "why" the injuries occurred:  "the PICU nurse and Rio Grande had [not] acted reasonably and prudently as set out in the above standard of care, or as set out in Nurse Fallon's report."   Finally, Dr. Clark opines that "if the PICU nurse and Rio Grande had acted reasonably and prudently as set out in the above standard of care, or as set out in Nurse Fallon's report, London Rios would not have suffered the cardiopulmonary arrest, ischemic brain injury, and neurologic impairment."

To constitute a good faith effort to establish the causal relationship element, the expert report need not marshal all of the plaintiff's proof, or present evidence as if the plaintiff was actually litigating the merits.  *See id.*   In this case, Dr. Clark's report exceeds a good faith effort to establish the element of causation, arguably approaching the type of evidence marshalling that is not required at this stage of the proceedings. *See Bowie*, 79 S.W.3d at 53 ("The report need not marshal all the plaintiff's proof . . . .").

c) Foreseeability

Appellants complain that Dr. Clark's report does not discuss the issue of foreseeability.  *See IHS Cedars Treatment Ctr. of Desoto, Texas, Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004) ("The two elements of proximate cause are cause in fact (or substantial factor) and foreseeability.").   Without any opinion explaining why the alleged injuries were reasonably foreseeable, appellants argue, Dr. Clark's report is not adequate to assist the court in determining whether appellees' claims have merit.

Appellants cite no authority and we have found none to support their contention that an expert report must opine on whether the specific injuries sustained by the

35

claimant could have been foreseen by the healthcare defendants; however, appellees have cited one decision by the Dallas Court of Appeals specifically declining to impose such a requirement. *See Adeyemi v. Guerrero*, 329 S.W.3d 241, 246 (Tex. App.—Dallas 2010, no pet.) ("Finally, [defendant] argues that [plaintiff's] expert report is insufficient because it never addresses foreseeability . . . . [Defendant] cites no authority, however, and we have found none, to support her contention that an expert report must opine on whether the specific injuries sustained by the claimant could have been foreseen by the defendant physician.") (internal citations omitted). In light of the foregoing precedent, we hold that the trial court did not abuse its discretion in refusing to impose a new requirement that the expert report address the element of foreseeability. *See Bowie*, 79 S.W.3d at 53 ("A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles.") (citing *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985)).

Accordingly, based on the foregoing, we conclude that Dr. Clark's report is sufficient because it (1) informs appellants of the specific conduct appellees have called into question—linking the departures from the standards of care to the alleged injuries—and (2) provides a basis for the trial court to conclude the claims are meritorious. *See id.* at 52.

### 4. Failure to Identify Particular Defendants

Finally, appellants complain that Dr. Clark opines about standards of care, alleged breaches, and causation "by the PICU staff at Rio Grande Regional Hospital." He explains that "PICU staff" refers both to "any and all staff (agents, servants, or

employees) of Rio Grande Regional Hospital" and specifically to "any and all staff (agents, servants, or employees) of Rio Grande Regional Hospital" and specifically to Nurse Ignacio. According to appellants, "by Dr. Clark's own definition, 'PICU staff' reaches far beyond the nurses caring for London Rios' care within the PICU doors to encompass 'any and all staff of Rio Grande Regional Hospital.'"

Appellants offer the following argument:

By overreaching, Dr. Clark fails to identify which standards of care, breaches, and causation opinions apply to Nurse Ignacio (or even to nurses generally). He does not explain why the standards, breaches, or causation should be attributed to Nurse Ignacio rather than other staff members. He does not identify which standards of care, breaches, or causation opinions, if any, apply to Rio Grande directly.

According to appellants, the generality in Dr. Clark's expert report violates the rule that an expert report must: (1) identify which standards of care apply to each defendant; (2) explain how each defendant breached a standard of care applicable to him; and (3) set forth the reasons that each breach proximately caused the plaintiff's injuries. *See Doades v. Syed*, 94 S.W.3d 664, 671-72 (Tex. App.—San Antonio 2002, no pet.) ("We hold [the expert's] report does not constitute a good faith effort to comply with the requirements of section 13.01 because it fails to set forth the standard of care for each of the defendant health care providers and contains mere conclusions regarding breach and causation.").

Although appellants are willing to concede "it is possible that an identical standard of care might apply to different defendants," they maintain that generic statements that assume this fact without explanation should reasonably be deemed conclusory. *See Gray v. CHCA Bayshore L.P.*, 189 S.W.3d 855, 859 (Tex. App.—Houston [1st Dist.] 2006, no pet.) ("[M]edical malpractice plaintiffs must provide an

37

expert report detailing standard of care, breach, and causation as to each defendant. Here, the report states, without explanation, that a single standard of care applied to both [the perioperative nursing staff] and [the anesthesiologist]. While it is possible that an identical standard of care regarding limb monitoring during and after surgery attaches to an anesthesiologist . . . and a perioperative nursing staff . . . , such generic statements, without more, can reasonably be deemed conclusory.") (internal citations omitted).

According to appellants, Dr. Clark's general statements about "PICU staff," particularly as he defines that term, do not constitute a good faith effort to comply with the statutory requirements. *See Eichelberger v. St. Paul Med. Ctr.*, 99 S.W.3d 636, 639 (Tex. App.—Dallas 2003, pet. denied) (concluding that report "does not represent a good faith effort to comply with the statutory definition of an expert report . . . [because the] report does not mention any of the [defendants] by name or summarize the ways in which any of the [defendants] breached the standard of care or caused [the plaintiff] any injury"); *Doades*, 94 S.W.3d at 671.

We have already concluded that Dr. Clark's report is sufficient because it (1) informs appellants of the specific conduct appellees have called into question and (2) provides a basis for the trial court to conclude the claims are meritorious. *See Bowie*, 79 S.W.3d at 52. Contrary to what appellants suggest, Dr. Clark's report is not at all comparable to the report at issue in *Eichelberger*, where the "expert report [did] not mention any of the [defendants] by name or summarize the ways in which any of the [defendants] breached the standard of care or caused [the plaintiff] any injury." *See Eichelberger*, 99 S.W.3d at 639. In his report, Dr. Clark makes appropriately specific

38

references to each defendant and fairly summarizes how each defendant breached the standard of care and caused the complained-of injuries.

We conclude that the specific information provided by Dr. Clark's report is a sufficient basis for determining whether appellants' breach of their duties to London Rios caused the injuries alleged by appellees. *See Palacios*, 46 S.W.3d at 880 ("[A] fair summary is something less than a full statement of the applicable standard of care and how it was breached . . . ."). Dr. Clark's report sets forth specific information about what care was expected from appellants, but not given, and it links the departures from the standards of care to the complained-of injuries. *See id.* ("[A] fair summary must set out what care was expected, but not given."); *Bowie*, 79 S.W.3d at 52 (holding that a "good-faith effort" must fairly summarize the causal relationship between the alleged breach and the injury). By providing this detailed information about the breaches of the applicable standards of care, Dr. Clark's report advises appellants of the specific conduct appellees have called into question and what appellants should have done differently. *See Bowie*, 79 S.W.3d at 53. Accordingly, we conclude that the trial court did not abuse its discretion in denying appellants' motions to dismiss insofar as the motions sought dismissal on the basis that Dr. Clark's report "does not represent an objective good faith effort to comply with the definition of an expert report in Subsection (r)(6)" with regard to the element of causation. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(l), (r)(6).

### E. Discussion of Dr. Seals' Report

The parties agree that there is no challenge to Dr. Seals' qualifications to render an expert opinion on causation. Dr. Seals' report states that Dr. Seals is Board certified

39

in Neurology with Special Competence in Child Neurology. Dr. Seals' report also states that he has been in the continuous practice of Pediatric Neurology since 1971.

### 1. Standard of Care

Appellants complain that Dr. Seals fails to address the applicable standard of care, for which we have already concluded the expert reports of Nurse Fallon and Dr. Clark are adequate. Nevertheless, out of abundance of caution and to ensure we have adequately addressed all issues raised by appellants that are necessary for final disposition of this appeal and provided the basic reasons for our decision, we will address appellants' complaints about the statements of the standards of care in Dr. Seals' report. *See* TEX. R. APP. P. 47.1.

With regard to the standard of care for appellees' fourth claim (i.e., that "[appellants] failed to timely intervene when London required nursing care"), Dr. Seals' report states that "if intervention is to be successful, it must occur early enough to allow reversal of the pathophysiologic sequence that otherwise will proceed inexorably to brain tissue changes and irreversible damage to the brain."

With regard to the standard of care for appellees' sixth claim (i.e., that "[Nurse] Ignacio failed to timely initiate the emergency protocols that London required"), Dr. Seals' report states that "if intervention is to be successful, it must occur early enough to allow reversal of the pathophysiologic sequence that otherwise will proceed inexorably to brain tissue changes and irreversible damage to the brain."

We conclude that, as to appellees' fourth and sixth claims against appellants, the foregoing standards of care are sufficiently specific to constitute a good faith effort because they provide enough information to inform appellants of the specific standards

of care applicable to the conduct appellees have called into question and to allow the trial court to determine that appellees' claims have merit. *See Bowie*, 79 S.W.3d at 53.

### 2. Breach

Next, appellants complain about Dr. Seals' report with respect to the element of breach of the applicable standards of care, for which we have already concluded the expert reports of Nurse Fallon and Dr. Clark are adequate. Nevertheless, out of abundance of caution and to ensure we have adequately addressed all issues raised by appellants that are necessary for final disposition of this appeal and provided the basic reasons for our decision, we will address appellants' complaints about Dr. Seals' report with respect to the element of breach of the applicable standards of care. *See* TEX. R. APP. P. 47.1.

Appellants complain that Dr. Seals fails to address any breach of the applicable standard of care. In his report, Dr. Seals states:

> I would accept the expressed opinions of the experts, Marguerite Fallon, RN and William Clark, M.D., regarding the breaches in standard of care for an infant such as London Rios during the time interval that she incurred hypoxic-ischemic brain injury on 1/31/09.

According to appellants, there are at least four problems with this approach, which demonstrate that "Dr. Seals' report fails the statutory requirements at virtually every fundamental level."

First, appellants complain that Dr. Seals' acceptance of others' opinions is, itself, conclusory. Appellants note that an expert must explain the basis for his statements and must link his conclusions to the facts. *See Gray v. CHCA Bayshore L.P.*, 189 S.W.3d 855, 859 (Tex. App.—Houston [1st Dist.] 2006, no pet.) ("The expert must explain the basis for his statements and must link his conclusions to the facts."). Here,

41

appellants complain, "Dr. Seals does not identify which opinions he is accepting." Appellants complain further, "He does not explain why he agrees with each of those opinions. Nor does he explain why each of those opinions is correct." Appellants note, "If no basis for an opinion is offered, the opinion is conclusory and is no evidence of anything." *See Jelinek*, 328 S.W.3d at 539-40 ("An expert cannot simply opine that the breach caused the injury . . . . Instead, the expert must go further and explain, to a reasonable degree, how and why the breach caused the injury based on the facts presented."). According to appellants, Dr. Seals' report "facially violates that rule."

Second, appellants complain that "Dr. Seals' report and CV do not demonstrate that he is qualified to opine on nursing standards of care or their breach, either generally or with regard to PICU nurses." Appellants point out that his report limits his purported qualifications to "render[ing] opinions on such medical and neurological conditions as are under consideration in a case such as London Rios."

Third, appellants complain that "Dr. Seals purports to accept Dr. Clark's and Nurse Fallon's opinions regarding 'the breaches in standard of care,' but he does not state that he accepts their opinions regarding the applicable standards of care themselves." Thus, according to appellants, "his report is not rooted in any identified standard of care he is shown to be familiar with."

Fourth, appellants complain that "Dr. Seals does not link any of the others' opinions on alleged breaches of the standards of care to the alleged injuries." According to appellants, "His report does not detail the causal relationship between any alleged breach and London Rios' injuries." *See Eichelberger*, 99 S.W.3d at 639.

42

Appellants complain that Dr. Seals' report "does not even provide insight into [appellees'] claims, which would itself be inadequate."

We agree with appellees that, by statute, appellees are permitted to fulfill different components of the expert report requirement with reports of different experts:

> Notwithstanding any other provision of this section, a claimant may satisfy any requirement of this section for serving an expert report by serving reports of separate experts regarding different physicians or health care providers or regarding different issues arising from the conduct of a physician or health care provider, such as issues of liability and causation. Nothing in this section shall be construed to mean that a single expert must address all liability and causation issues with respect to all physicians or health care providers or with respect to both liability and causation issues for a physician or health care provider.

TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(i); *see also Walgreen Co. v. Hieger*, 243 S.W.3d 183, 187 n.2 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) ("[U]nder section 74.351(i), expert reports may be considered together in determining whether the plaintiff has provided adequate expert opinion regarding the standard of care, breach, and causation.").

We have concluded that the expert reports of Nurse Fallon and Dr. Clark are adequate on the elements of (1) standard of care; (2) breach; and (3) causation. Accordingly, we find appellants' complaints about Dr. Seals' use of those reports to be without merit. We conclude that the specific information provided by Dr. Seals' report is a sufficient basis for determining whether appellants breached their duties to London Rios. *See Palacios*, 46 S.W.3d at 880 ("[A] fair summary is something less than a full statement of the applicable standard of care and how it was breached . . . ."). Dr. Seals' report sets forth specific information about what care was expected from appellants, but not given. *See id.* ("[A] fair summary must set out what care was expected, but not

given."). By providing this detailed information about the breaches of the applicable standards of care, Dr. Seals' report advises appellants of the specific conduct appellees have called into question and what appellants should have done differently. *See Bowie*, 79 S.W.3d at 53. Accordingly, we conclude that the trial court did not abuse its discretion in denying appellants' motions to dismiss insofar as the motions sought dismissal on the basis that Dr. Seals' report "does not represent an objective good faith effort to comply with the definition of an expert report in Subsection (r)(6)" with regard to the element of breach of the applicable standards of care. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(l), (r)(6).

### 3. Causation

Next, appellants complain about Dr. Seals' report with respect to the element of causation, for which we have already concluded the expert report of Dr. Clark is adequate. Nevertheless, to ensure we address all issues raised and necessary for final disposition of this appeal, we will address appellants' complaints about Dr. Seals' report with respect to the element of causation. *See* Tex. R. App. P. 47.1.

Appellants make a twofold challenge to the adequacy of Dr. Seals' report with regard to the element of causation: (a) Dr. Seals does not link his causation opinions to any alleged breach of any purported standards of care; and (b) Dr. Seals does not discuss foreseeability.

a) Link between Breach and Injury

Appellants complain that "Dr. Seals' causation opinions are, themselves, insufficient . . . [because] [h]e does not explain how or why any conduct by Rio Grande or Nurse Ignacio proximately caused the alleged injuries." Appellants fault Dr. Seals for

44

his "attempts to link the alleged injuries with the reported events in the abstract" when he opines as follows:

> I believe, within a reasonable degree of medical certainty, that all of London's neurologic impairments, which include intractable seizure disorder, developmental delays and spastic quadriparesis, are the residual clinical expression of the hypoxic-ischemia encephalopathy and consequent brain damage incurred during the documented cardio-respiratory arrest of 1/31/09 which resulted from the dislodgement of her tracheostomy tube.

Appellants ask this Court to "[n]ote carefully how Dr. Seals chose his language so as not to opine that the dislodgment of her tracheostomy tube was caused by the breach of any standard of care by Rio Grande or Nurse Ignacio." Appellants argue that the report is inadequate because "[n]owhere [in it] does Dr. Seals offer any opinions regarding the legal responsibility for the underlying events."

Appellants make the following argument:

> [Appellees] cannot piggyback Dr. Seals' report on to the reports of Dr. Clark and Nurse Fallon to supply this missing link. Even indulging Dr. Seals' conclusory statement that he 'would accept' Dr. Clark's and Nurse Fallon's opinions about 'breaches in standard of care,' he does not take the next critical step to opine that those breaches caused the dislodgment of London Rios' tracheostomy tube. And it does Dr. Seals little good to adopt the opinions of Dr. Clark and Nurse Fallon—neither of them opines that Nurse Ignacio or Rio Grande caused the 'dislodgment' of the trachestomy tube.

*Cf. GMC v. Iracheta*, 161 S.W.3d 462, 472 (Tex. 2005) ("[Plaintiff] attempts to borrow from each of her experts pieces of opinion that seem to match, tie them together in an ill-fitting theory, discard the unwanted opinions, disregard the fact that the experts fundamentally contradicted themselves and each other, and then argue that this is some evidence to support the verdict. Inconsistent theories cannot be manipulated in this way to form a hybrid for which no expert can offer support.").

45

Based on the foregoing, appellants argue that because "Dr. Seals' report does not link the alleged injuries to any defendant or to any alleged breach of the standard of care . . . [his report] is, in its entirety, a deficient report that does not constitute a good faith effort to meet the statutory requirements."

Again, we agree with appellees that Dr. Seals was allowed to review the reports of the other experts, rely on them, and incorporate the opinions of the other experts into his report. *See Christus Spohn Health Sys. Corp. v. Lackey*, No. 13-10-00222-CV, 2010 Tex. App. LEXIS 6720, at *10 (Tex. App.—Corpus Christi Aug. 19, 2010, no pet.) (mem. op.) ("[N]othing in the health care liability statute prohibits an otherwise qualified physician from relying on a nurse's report in the formation of the physician's own opinion.") (quoting *Kelly v. Rendon*, 255 S.W.3d 665, 676 (Tex. App.—Houston [14th Dist.] 2008, no pet.)); *see also Martin v. Abilene Reg'l Med. Ctr.*, No. 11-04-00303-CV, 2006 Tex. App. LEXIS 897, at *14-15 (Tex. App.—Eastland Feb. 2, 2006, no pet.) (mem. op.) ("The trial court abused its discretion by not reading the reports of [nurse] and [doctor] together to conclude that [plaintiff's] reports provided a fair summary of the experts' opinions regarding the causal relationship between [hospital's] actions and the stent reocclusion.").

In his report, Dr. Seals incorporates the opinions of Nurse Fallon and Dr. Clark, which we have concluded are sufficient to establish all three elements: (1) standard of care; (2) breach; and (3) causation. Dr. Seals then opines in further support of the causal connection between the allegedly negligent conduct of Nurse Ignacio and Rio Grande Regional involving the dislodgement of the tracheostomy tube and the complained-of injuries by stating "[b]ased on my education, training, and professional

46

experience as a pediatric neurologist I believe, within a reasonable degree of medical certainty, all of London's neurological impairments . . . are the residual clinical expression of the hypoxic-ischemia encephalopathy and consequent brain damage incurred during the documented cardio-respiratory arrest of 1/31/09 which resulted from the dislodgement of her tracheostomy tube."

Accordingly, based on the foregoing, we conclude that Dr Clark's report is sufficient because it (1) informs appellants of the specific conduct appellees have called into question—linking the departures from the standards of care to the alleged injuries—and (2) provides a basis for the trial court to conclude the claims are meritorious. *See Bowie*, 79 S.W.3d at 52.

b) Foreseeability

As with Dr. Clark's report, appellants complain that Dr. Seals' report does not discuss the issue of foreseeability. *See Mason*, 143 S.W.3d at 798. Without any opinion explaining why the alleged injuries were reasonably foreseeable, appellants argue, Dr. Seals' report is not adequate to assist the court in determining whether appellees' claims have merit. Again, we conclude that the trial court did not abuse its discretion by refusing to impose a new requirement that expert reports include opinions on the issue of foreseeability.

We conclude that the specific information provided by Dr. Seals' report is a sufficient basis for determining whether appellants' breach of their duties to London Rios caused the injuries alleged by appellees. *See Palacios*, 46 S.W.3d at 880. Dr. Seals' report sets forth specific information about what care was expected from appellants, but not given, and it links the departures from the standards of care to the

47

complained-of injuries. *See id.*; *Bowie*, 79 S.W.3d at 52 (holding that a "good-faith effort" must fairly summarize the causal relationship between the alleged breach and the injury). By providing this detailed information about the breaches of the applicable standards of care, Dr. Seals' report advises appellants of the specific conduct appellees have called into question and what appellants should have done differently. *See Bowie*, 79 S.W.3d at 53. Accordingly, we conclude that the trial court did not abuse its discretion in denying appellants' motions to dismiss insofar as the motions sought dismissal on the basis that Dr. Seals' report "does not represent an objective good faith effort to comply with the definition of an expert report in Subsection (r)(6)" with regard to the element of causation. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(l), (r)(6).

## F. Discussion of Other Claims

In addition to the foregoing, appellants complain that the trial court erred in failing to dismiss appellees' claims for gross negligence, malicious injury to a child, felony injury to a child, and direct liability against appellant Rio Grande. According to appellants, there are no opinions in any of the reports regarding malice or other required elements of these claims. *See St. David's Healthcare P'ship, L.P., LLP v. Esparza*, 348 S.W.3d 904, 906 (Tex. 2011) (holding, in suit alleging premises liability, that "[t]he trial court should have dismissed Esparza's claim for failure to comply with the expert report requirements of the TMLA").

### 1. Gross Negligence

Appellees argue that their expert reports were not required to address the legal standards for gross negligence because opinions on these issues are not required by the statute and because they involve legal standards on which a healthcare provider

48

would not be qualified to provide an expert opinion. Appellees note that both the Fourteenth Court of Appeals in Houston and the Second Court of Appeals in Fort Worth have recently rejected arguments similar to those made by appellants in this case. *See Nowzaradan v. Ryans*, 347 S.W.3d 734 (Tex. App.—Houston [1st Dist.] 2011, no pet.); *Benish v. Grottie*, 281 S.W.3d 184 (Tex. App.—Fort Worth 2009, pet. denied).

In *Nowzaradan*, the Fourteenth Court of Appeals recognized that the medical standard of care is the same in claims of ordinary negligence and gross negligence, with the only difference between the two being "the extent to which the physician breached the standard." *Nowzaradan*, 347 S.W.3d at 741. Noting that section 74.351 is concerned only with "*the manner* in which the physician breach[ed] the applicable standard of care," not with "*the extent* of the breach," the Fourteenth Court of Appeals rejected the defendant's argument that the plaintiff's expert report was insufficient. *Id.* at 741 (emphasis in original).

The Second Court of Appeals also rejected claims that a gross negligence cause of action against a healthcare provider required a separate expert report, noting that it had not found any authority to support the defendants' argument that such an expert report was required. *Benish*, 281 S.W.3d at 192. Additionally, the court questioned the practicality and workability of any such requirement, noting that the time constraints and limited discovery involved in filing a Chapter 74 expert report make it "doubtful that an expert preparing a section 74.351 report would ever be able to offer an opinion that a healthcare provider acted with the requisite state of mind to establish gross negligence. *Id.*

49

We agree with appellees. To the extent appellants' motions sought dismissal of appellees' claims based on the failure of their expert reports to discuss the experts' opinions on issues other than the three elements that are required (i.e., (1) standard of care, (2) breach, and (3) causal relationship), the trial court did not abuse its discretion in denying the motions. *See Bowie*, 79 S.W.3d at 53.

### 2. *Injury to a Child*

With regard to appellants' complaint that appellees' expert reports fail to discuss appellees' claims for malicious or criminal injury to a child, appellees contend that these claims allege intentional torts and criminal conduct, which Chapter 74 does not cover. *See Nexus Recovery Ctr., Inc. v. Mathis*, 336 S.W.3d 360, 365 (Tex. App.—Dallas 2011, no pet.) ("Not every cause of action for personal injuries or death arising in a health care setting is a health care liability claim."). According to appellees, these claims fall outside the ambit of Chapter 74 because criminal and intentionally tortuous behavior is not "an inseparable part of the rendition of medical care or a departure from the accepted standards of health care." *Holguin v. Laredo Reg'l Med. Ctr., L.P.*, 256 S.W.3d 349, 353 (Tex. App.—San Antonio 2008, no pet.); *see also Drewery v. Adventist Health System/Texas, Inc.*, 344 S.W.3d 498, 505 (Tex. App.—Austin 2011, pet. filed) ("In the present case, however, no reasonable argument could be made that the nurses' alleged conduct—which included painting Drewery's nails and writing their names on his feet—was a necessary part of preparing him for surgery to remove his tonsils.").

We agree with appellees. To the extent appellants' motions sought dismissal of appellees' claims based on the failure of their expert reports to discuss the experts' opinions on issues other than the three required elements of (1) standard of care, (2)

50

breach, and (3) causal relationship, the trial court did not abuse its discretion in denying the motions. *See Bowie*, 79 S.W.3d at 53.

### 3. Direct Liability Against Rio Grande

Finally, appellants argue that the reports do not support a conclusion that any direct liability claim against Rio Grande has merit. Appellants contend that Nurse Fallon did not opine about any standard or breach that applied to Rio Grande. Furthermore, according to appellants, Dr. Clark did not establish any qualification to testify regarding the standards of care applicable to an institutional healthcare provider. Finally, appellants argue that Dr. Seals did not provide any opinions about Rio Grande whatsoever. According to appellants, to the extent that appellees allege any claims of direct liability against Rio Grande, the trial court abused its discretion in refusing to dismiss them.

Appellees disagree. According to appellees, their expert reports detail the standard of care, breach, and causation elements specific to the three claims asserted directly against Rio Grande:

1. [Rio Grande] failed to provide properly trained and experienced PICU nurses to care for London;

2. [Rio Grande and Nurse Ignacio] failed to properly monitor London; and

3. [Rio Grande and Nurse Ignacio] failed to provide the equipment London required;

We agree with appellees. For the reasons set forth above, we conclude that the trial court did not abuse its discretion in denying appellants' motions to dismiss insofar as the motions sought dismissal on the basis that Nurse Fallon's, Dr. Clark's, and Dr. Seals' report do "not represent an objective good faith effort to comply with the definition

51

of an expert report in Subsection (r)(6)" with regard to the elements of standard of care, breach, and causation as to each of the three claims of direct liability asserted against Rio Grande.  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(l), (r)(6).

Appellants' seven issues, which we have reorganized and addressed as one issue, *see* TEX. R. APP. P. 47.1., are overruled because appellants have not established that the trial court abused its discretion in denying their motions to dismiss.

### III. CONCLUSION

The order of the trial court is affirmed.

_____
ROGELIO VALDEZ
Chief Justice

Delivered and filed the
24th day of August, 2012.